UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| MAG JEWELRY CO., INC.<br>Plaintiff<br><br>vs.<br><br>CHEROKEE, INC., ROBERT MARGOLIS AND TARGET CORPORATION d/b/a TARGET STORES and STYLE ACCESSORIES, INC.<br>Defendants | : | C.A. No. 04-174 T |

**DEFENDANT CHEROKEE, INC'S RULE 12.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. Local Rule 12.1, defendant, Cherokee, Inc. ("Cherokee"), submits this Statement of Undisputed Facts in Support of its Motion for Summary Judgment.

1. Plaintiff, Mag Jewelry Co., Inc. ("Mag"), claims to have created a piece of crystal jewelry referred to as the "Crystal Angel" in 1992. Mag obtained a Certificate of Registration from the Register of Copyrights for the Crystal Angel in 1995. (See Amended Complaint ("Compl."), ¶¶ 8-11.)

2. Mag brought this action in January 2002 and alleged that Cherokee had within the past three years manufactured, marketed, distributed and sold crystal angel jewelry items which are copied from, and which are identical and/or substantially similar to, Mag's copyrighted Crystal Angel design. (See Compl., ¶ 15.)

3. Mag further alleged that Cherokee's actions infringed Mag's copyright in and related to the Crystal Angel. (See Compl., ¶ 24.)

4. Cherokee licenses, for example, the "Cherokee" trademark to defendant, Target Corporation ("Target"), for Target's exclusive use in the United States. (Exhibit 1, Rule 30(b)(6) deposition of Cherokee, Inc., at 11:23-24.)

5. Cherokee does not design, manufacture or sell the products that Target sells under the Cherokee trademark. Cherokee only licenses its trademarks and trademarks of third parties that Cherokee represents. (See id. at 8:1-6, 18:24-19:2.)

6. On November 12, 1997, Cherokee and Target entered into a written License Agreement governing the licensing of Cherokee's mark to Target. (See License Agreement, Exhibit 2, at p. 17.)

7. Pursuant to the License Agreement, Target is granted the right to sell ten (10) broad categories of products under the Cherokee mark. (See id. at p. 2.)

8. One category of products Target is licensed to sell under the Cherokee mark is "Men's, Women's and Children's Accessories," which include luggage, jewelry, handbags, small leather goods, belts, neckwear, hairgoods, hats, rainwear, gloves, hosiery, slippers, sunglasses/eyewear and watches. (See id.)

9. The License Agreement requires Target to pay Cherokee a royalty based on the total volume of retail sales of Cherokee-branded products each fiscal year. (See id. at p. 3.)

10. Cherokee does not receive royalty payments from Target for specific items within each category of products. Rather, it is paid a royalty on the total net sales of products bearing the Cherokee mark. (See Exhibit 1 at 13:3-14:14.)

11. Target provides Cherokee with regular reports showing the products sold by category during a given time period under the License Agreement, but Cherokee is not provided with reports that would show the amount of royalties, if any, it received from sale of the crystal

angel jewelry that are the subject matter of this lawsuit. (See id. at 14:5-22, 15:20-16:4, 17:5-21.)

12. Cherokee does not know and does not have records that would show whether it received any royalty payments for the crystal angel jewelry that is the subject matter of this lawsuit. (See id. at 17:5-21.)

13. Though Cherokee has certain enumerated rights under the License Agreement (e.g. audit rights, quality control inspections), it does not have the right or ability to supervise Target's sales of products bearing the Cherokee mark to ensure that the products do not violate a third party's copyright. (See Exhibit 1 at 19:7-20:10; see Exhibit 2, at pp. 5, 6.)

Dated: July 29, 2005

CHEROKEE, INC.
By its Attorneys

Craig M. Scott, Esq. (#4237)
Christine K. Bush, Esq. (#5587)
DUFFY SWEENEY & SCOTT, LTD
One Turks Head Place, Suite 1200
Providence, RI 02903
(401) 455-0700 (Tel)
(401) 455-0701 (Fax)

**CERTIFICATION**

TO:

Thomas A. Tarro, III, Esq.
Kris R. Macaruso Marotti, Esq.
The Law Firm of Thomas A. Tarro III, Esq.
The Summit East, Suite 330
300 Centerville Road
Warwick, RI 02886

Thomas R. Noel, Esq.
Noel & Gyorgy
50 South Main St.
Providence, RI 02903

I hereby certify that I caused a true copy of the within *Rule 12.1 Statement of Undisputed Facts* to be sent via First Class Mail to the above named counsel of record on the 29th day of July, 2005.

Linda Cardente

*H:\Clients\Target Corporaton.MAG\Style Fashion Jewelry - Mag\Pleadings\Cherokee Rule 12.1 Statement.doc*

on which the examination is to be conducted?
A Yes, I believe I did.
Q And are you the person most knowledgeable at the corporation with regard to the subject matter on which this deposition is going to be conducted?
A Yes, I am.
Q Now, how long have you been employed by Cherokee, Inc.?
A A little bit over a year.
Q And prior to that where were you employed?
A Most recently prior, I was with an investment banking firm called RSM Equico. And prior to that, I was with a hedge fund. I was CFO of a hedge fund called Dorchester Capital. Prior to that I was with Bank of America Securities and then prior to that I was with a firm called Libra Investments, which is now called Libra Securities, which is where I first got to know the Cherokee.
Q Now, with regard to the subject matter of the lawsuit, are you familiar with that?
A Only to the extent of reading, you know, this (indicating) and the other sort of legal materials that have been forwarded to me about it.
Q Okay. You weren't affiliated with the corporation



at that point in time when Cherokee was transacting business with Target, with Target Stores in regards to a crystal angel that was the subject matter of this lawsuit, is that correct?
A That's correct. I was not an employee of Cherokee at that time.
Q Now, Cherokee is a Delaware corporation?
A Correct.
Q And where is its headquarters?
A Van Nuys, California and that's our only location.
Q What is the address there?
A 6835 Valjean, V-A-L-J-E-A-N, all one word, Avenue, Van Nuys, N-U-Y-S, California, 91406.
Q Is this a privately held or public corporation?
A Public corporation.
Q And does it -- is it on any stock exchange, particular stock exchange?
A NASDAQ, national market system.
Q Okay. And Cherokee, Inc., was incorporated in 1988?
A I don't know. I suppose so.
Q According to the Answers to Interrogatories it was incorporated May 17, 1988.
A I have no reason to believe that's not true.



Q Okay. What is the nature of the business of Cherokee, Inc.?
A We are since the mid-nineties a licensing corporation.
Q What do you license?
A Brands we own and brands we represent.
Q What brands do you own?
A We own Cherokee, we own Sideout. We own Carole Little and brands related to Carole Little Brand and then a few others, but they're of nominal consequence. Cherokee is our largest brand and trademark.
Q And what is the Cherokee trademark associated with what type of product?
A Primarily apparel, clothing, footwear, that sort of thing. Historically we were a clothing manufacturer and footwear manufacturer since our inception through about the mid-nineties. And then we changed our business plan to become a licensor.
Q Now, with regard to the trademark that you're referring to, the Cherokee trademark, when was that obtained?
MR. SCOTT: Objection, form.
THE WITNESS: I beg your pardon?



MR. SCOTT: I'm objecting to the form of the question. It's -- You're asking when a trademark registration was obtained? Are you asking when trademark rights accrued by virtue of use and commerce?
MR. TARRO: No, no, the trademark registration, when was that obtained?
MR. SCOTT: I still object. I think there are several, Tom, so you might want to clarify that.
MR. TARRO: Well, I'm just going to clarify it.
A I believe the company was started in the early seventies. So, I presume it would have been obtained at that time.
Q Now, you mentioned wearing apparel and the trademark is used with regard to the wearing apparel. This case concerns jewelry, all right, and the use of the Cherokee trade name in regards to the sale of that jewelry by Target stores. Is there a separate trademark registration that applies to that?
A You mean for a piece of jewelry, per se?
Q Yes.

A I don't know. I don't believe so, but I honestly don't know. I've never seen any of our trademark reports from our trademark attorneys that show a specific type of Cherokee brand trademark designated, you know, for use only in jewelry. But I suspect --

MR. SCOTT: Don't speculate and don't guess.

A -- Yeah, I -- I just -- I don't know.

MR. SCOTT: You weren't given instructions in the beginning which is no fault of Mr. Tarro's at all, but I don't want you to speculate or to guess, I just want you to speak from your -- testify from your personal knowledge.

THE WITNESS: Okay.

**Q (By Mr. Tarro) And with regard to the corporation, does it have a website?**

A Yes.

**Q What is the website address?**

A WWW.CHKE.COM.

**Q Now, prior to you becoming the chief financial officer, who held that position?**

A A fellow named Kyle Westcote*.

**Q Do you know if an individual by the name of Carol**



**Gratszke, G-R-A-T-Z-K-E, is still employed by the company?**

A Yes, she is nominally our corporate secretary and she was also the CFO prior to Kyle Westcote.

MR. SCOTT: Can I just interrupt for a second? I'm sorry.

(Brief recess)

MR. SCOTT: I'm sorry.

**Q (By Mr. Tarro) Now, as a corporate secretary, she is still employed by the corporation?**

A Correct. Although, she doesn't come into the office very often.

**Q Okay. Who are the -- who is the president of the corporation?**

A Howard Siegel, S-I-E-G-E-L.

**Q And how long has he held that position?**

A I'm not sure, approximately four or five years.

**Q Okay. And Robert Margolis, what is his position in the company?**

A He's the chairman and the CEO.

**Q Now, what is the relationship between Cherokee, Inc., and Target Corporation?**

A We license our Cherokee trademark to Target for their exclusive use in the United States.



**Q And you do that pursuant to a written agreement?**

A Correct.

**Q And have you brought that written agreement with you?**

A Yes. I believe my lawyer has a copy.

**Q May I see it?**

MR. SCOTT: I've got a copy here, Tom. Just -- you didn't request it for this proceeding today, but I'm happy to give you a copy.

MR. TARRO: Yeah. I think I asked for any and all documents that were not previously produced. I don't think that's ever been produced.

MR. SCOTT: This is my only copy.

MR. TARRO: We'll make a copy and mark this as exhibit number two.

(Whereupon the written agreement was marked Plaintiff's Exhibit No. 2)

**Q (By Mr. Tarro) With regard to this license agreement, that's been marked as Exhibit Number Two, it's between Cherokee, Inc., and Dayton Hudson Corporation. Are you familiar with the relationship between Dayton Hudson Corporation and Target?**



A Somewhat. Dayton Hudson Corporation was the predecessor to what Target Corporation is now.

**Q And with regard to the licensing agreement, with regard to the products that are actually licensed, could you tell me what the arrangement with regard to compensation with regard to the jewelry that is the subject matter of this lawsuit?**

MR. SCOTT: Objection to form. You can answer if you can.

A The way that it works is, in general we license a broad number of categories for Target to use to design, develop or what have you, you know, apparel with the Cherokee label on it, shoes with the Cherokee label on it, could be for kids, could be for women's, could be for men's. And then based upon the volume of retail sales dollars of Cherokee branded products achieved throughout a given fiscal year, they will pay us a certain percentage. So, for example, they pay us two percent up to the first 300,000,000 of sales in a given fiscal year. One and a half percent for the next 400,000,000 sales of that year, eight-tenths of one percent for the next 300,000,000 sales of that year and those three totals should total 1,000,000,000. And then

they pay us seven tenths of a percent on all sales
of Cherokee branded merchandise above
$1,000,000,000.00 each year. And then it starts
over at zero each fiscal year.
**Q And how does Target report to Cherokee the sales,
in what format, what method?**
A We receive a royalty report which shows the overall
totals and we get those on a monthly basis from
Target, but they pay us on a quarterly basis. And
then we also receive a slightly more detailed
report which breaks up that overall total into
certain categories. So, it could be men's apparel,
women's apparel, you know, kid's, accessories and I
think that sort of thing.
**Q Okay. Do you have any monthly reports or any
reports that pertain to the piece of jewelry that
is the subject matter in the lawsuit that was sold
by Target bearing the Cherokee name?**
A I don't believe any of the reports that Target has
ever provided to us ever break out the amount of
sales by something that specific. It's more broad
categories we receive.
**Q For the purpose of this deposition, I'm showing you
a crystal angel pin that's on a card with the name**



**of Cherokee and it's a sale price of 4.99.**
MR. TARRO: I'm going to make a -- I've
made a copy of the card and I'm going to mark it as
exhibit number three.
(Whereupon the copy of card
with crystal angel was marked
as Plaintiff's Exhibit No. 3)
**Q (By Mr. Tarro) You can look at the sample, okay.
Focusing on the piece of jewelry and the card, does
Cherokee supply any of the component parts with
regard to that particular item?**
**(Witness views document and sample)**
A No.
**Q Okay. Does Cherokee provide any of the barcode
labels that are used with regard to the product?**
A No.
**Q The barcode labels would be supplied by Target?**
A Correct, there would be an outside vendor that
supplies that to them.
**Q And if I understand you correctly, Cherokee, Inc.,
would not get a report specific to the jewelry
pieces that were sold.**
A Well, the report may say costume jewelry with a,
you know, particular total or, you know, fine



jewelry or something like that, but it wouldn't
break it down into saying, you know, this number
many angels, this number many crystal boats, this
number many, you know, horseshoes.
**Q Could you tell me during the period of time that
the crystal angel necklace was sold under the
Cherokee name by Target, if Cherokee, Inc.,
received any compensation by way of a royalty for
use of its name?**
A I certainly hope so. I mean we're supposed to.
But I couldn't tell you specifically if in fact,
you know, the -- the sub -- sub-category marked,
you know, let's -- for costume jewelry included all
of the specific SKUs associated with that
particular jewelry item. But I could -- you know,
but we do have a jewelry auditor we send in every
year to review that.
**Q Could you tell me one way or the other, okay, with
some certainty, whether or not Cherokee was paid a
royalty with regard to the crystal angel necklaces
that are the subject matter of the lawsuit?**
MR. SCOTT: Yes or no.
A Yes, I believe so. I mean I would expect that
Target would have paid us on those.



**Q I know you would expect it. I'm looking -- if it
was paid, okay, how much was paid.**
A I couldn't tell you with any certainty, but I -- I
--
**Q Do you have any records that would show that?**
A That would show specifically that we got paid on
the angel item?
**Q Yes.**
A No, it would show that we had been paid for a
certain broad jewelry category, but it wouldn't
necessarily show that we got paid for, you know, an
angel.
**Q So, you can't tell me, first of all, with
certainty, if you did get paid a royalty with
regard to the crystal angel necklaces that are the
subject matter of the lawsuit, correct?**
A Correct, assuming that if I had a report that said
crystal angel necklace, this is the amount of
royalties. That would -- that being certainty,
then I would say no, I couldn't tell you with
certainty.
**Q Now you indicate that you send in an auditor every
year to determine if the royalties have been paid
and presume there's license and agreement on it?**

A Correct. We have audit -- annual audit rights and he goes in every year and basically looks -- he'll have copies of our royalty reports that Target has sent to us and then he'll review Target's records and -- just to make sure that Target is paying us on everything that, you know, they've sold that has a Cherokee brand or trademark to it.

**Q And who is the auditor? Is it a company?**

A A fellow named Elliott Greller of Royalty Control Group.

**Q Can you spell his last name?**

A G-R-E-L-L-E-R.

**Q And where is Royalty Control Group located?**

A I think New Jersey.

**Q Would you have a telephone number for him?**

A I don't. I -- I don't.

**Q Now, with regard to the current business operation, how many employees are there?**

A Sixteen.

**Q And with regard to the sixteen employees, are any of those employees designated for jewelry purchases or jewelry design?**

A No.

**Q Okay. Does your company get involved in that at all, either directly or indirectly?**



A No, we don't -- we don't design anything and we don't, you know, manufacture anything.

**Q Okay. Do any employees of the company or outside representatives attend jewelry or trade shows?**

A Not to my knowledge.

**Q Does the company have a policy with regard to investigating a product to determine if it's copyrighted before the Cherokee trade name is used for the purpose of selling that product?**

A Could you give an example? I guess I'm not really sure what you're asking.

**Q Well, in this particular case there was a copyright with regard to the crystal angel that is the subject matter of the lawsuit and I want to know if the company, Cherokee, Inc., has a policy with regard to investigating whether or not a trademark exists with regard to a product which is going to be sold under its trade name.**

MR. SCOTT: Objection to form.

A Not really, because the way that the licensing agreement works, we don't have a whole lot of control over the products that end up being branded Cherokee. So, for example, you know, we may not have even known this was being sold per se --



**Q When you say, we, you're talking about the --**

A We, the sixteen employees.

**Q -- the crystal angel necklace that --**

A Correct, that was branded Cherokee. Right. We, you know, there -- there wouldn't be any sort of exploratory work done prior to that being sold. We trust our licensees to, you know, to -- to use the Cherokee brand as they see fit, you know, as best they can.

**Q Under the licensing agreement, is there any indemnification provision?**

A Yes.

**Q And has Cherokee in this particular lawsuit made any claim against Target stores for indemnification with regard to the crystal angel that is the subject matter of the lawsuit?**

A Yeah, I suppose so. I mean I think it's common knowledge that --

MR. SCOTT: Don't guess.

A -- we'll be indemnified in this.

MR. SCOTT: Don't guess.

MR. TARRO: I have no further questions.



CROSS-EXAMINATION

MR. NOEL: I have just one or two.

(By Mr. Noel)

**Q Mr. Riopelle, as we introduced ourselves earlier, I think you know I represent Style Accessories in this matter. There was a document marked for identification as a licensing agreement in this deposition. Have you seen that agreement prior to today?**

A Yes.

**Q Did you have anything to do with the drafting of that agreement?**

A No, that was prior to my time.

**Q But in your other responsibilities prior to your employment with Cherokee, did you have any involvement in the drafting of that document?**

A No.

MR. NOEL: I have nothing further.

MR. SCOTT: No questions.

MR. TARRO: Thank you.

(Whereupon the deposition concluded at 10:48 a.m.)

COPY

# LICENSE AGREEMENT

THIS LICENSE AGREEMENT, is made and entered into as of the 12th day of November, 1997, by and between Cherokee, Inc., 6835 Valjean Avenue, Van Nuys, California 91406 ("Licensor"), and Dayton Hudson Corporation, 33 South Sixth Street, Minneapolis, Minnesota 55402 ("Licensee"), collectively referred to as the "Parties".

WHEREAS, Licensor is the owner of the "Cherokee" trademark, various other marks incorporating the name Cherokee and certain common law rights in and to the name Cherokee, with various stylized designs (collectively, the "Trademark"), copies of which are attached as Exhibit A hereto, and the goodwill associated with the Trademark; and

WHEREAS, Licensor and Licensee desire to enter into this License Agreement with respect to the sale, manufacture and importation of certain merchandise, all upon the terms and conditions herein set forth;

NOW, THEREFORE, the Parties hereto agree as follows:

1. Grant of License.

a. Upon the terms and conditions contained in this Agreement, Licensor hereby grants to Licensee, and Licensee hereby accepts, the exclusive (as defined hereinbelow) right and license to use the Trademark, during the term provided in Section 2 below, solely in connection with the sale of the merchandise bearing the Trademark, in the categories indicated below (the "Merchandise"), solely by DHC Retail Operations (as hereinafter defined), located in the United States of America (the "Retail Operations"), and to manufacture such Merchandise (and have such Merchandise manufactured) solely for sale by the Retail Operations. Such rights shall include the right to advertise the Trademark in connection with the Merchandise. Such license shall not include the right to grant sublicenses to third parties. The foregoing license is limited to use of the Trademark in connection with the sale of Merchandise by the Retail Operations and does not include the right to use the Trademark in connection with the manufacture, distribution or sale of any products except for Merchandise sold by the Retail Operations. As used herein, the Retail Operations shall mean Dayton's, Hudson's, Marshall Field's, Mervyn's, Target Stores, Target Greatland, SuperTarget, and any other store opened by Licensee, within the United States, during the Term of this Agreement, and/or any other merchandising activities undertaken by Licensee, within the United States, during the Term of this Agreement, including but not limited to direct mail, interactive on line or kiosk selling. If Licensee desires to open a Retail Operation outside the United States, and Licensor owns the Trademark in such other country, and if Licensor has no

license in such other country, this Agreement shall then apply to Licensee in such other country.

b. The following categories of Merchandise, shall be exclusive to Licensee, in the United States, in all classes of trade:

(i) Men's, Women's and Children's Apparel (including, but not limited to intimate apparel, foundations and sleepwear, but excluding industrial and school uniforms)*.

(ii) Men's, Women's and Children's Footwear (excluding nurses and lab technicians shoes).

(iii) Men's, Women's and Children's Accessories, including, but not limited to, luggage*, jewelry, handbags*, small leather goods, belts, neckwear, hairgoods, hats, rainwear, gloves, hosiery, slippers, sunglasses/eyewear* and watches*.

(iv) Bed and Bath Products and Accessories.

(v) Luggage*, Sportsbags* and Backpacks*.

(vi) Home Textiles.

(vii) Domestics and Home Decor.

(viii) Home Furnishings.

(ix) Sporting Goods.

(x) Cosmetics, Bath and Body Products.

**The categories that are asterisked are the subject of unexpired wholesale license agreements between Licensor and unaffiliated third parties. The categories that are the subject of such agreements will become part of Licensee's exclusive categories, upon expiration/termination of such agreements, as set forth in Section 7b hereinbelow; provided, however, the Parties agree that the wholesale license agreements applicable to apparel and luggage shall be terminated by Licensor upon execution of this Agreement by both Parties.*

Licensee may propose additional classes of merchandise for inclusion in this Agreement. Should Licensor, in its sole discretion, determine to include such additional classes of merchandise, this Agreement shall be amended to include such additional classes of merchandise within the definition of Merchandise. Licensor shall be responsible for all costs



ǵ6

and attorney's fees incurred by Licensor in obtaining trademark registration under the laws of the United States for such additional classes of merchandise, if necessary and available.

2. Term.

a. Initial Term. The initial term of this Agreement shall commence on February 1, 1998 and shall end January 31, 2004. As used hereinafter, the term fiscal year shall mean the 12 month period ending at midnight on the Saturday closest to January 31 (hereinafter "Fiscal Year").

b. Extended Terms. Provided that Licensee is current in its payments of the Minimum Guaranteed Royalty (as hereinafter defined) for the Fiscal Year ending in 2004, this Agreement will automatically renew for the Fiscal Year ending in 2005, and will continue to automatically renew for successive one (1) Fiscal Year terms, provided that Licensee has paid a Minimum Guaranteed Royalty equal to or greater than $9,000,000 for the preceding Fiscal Year. (The Initial Term and the Extended Terms, if any, are hereinafter referred to as the "Term").

c. Termination. Notwithstanding Section 2b above, (i) Licensee may terminate this Agreement effective January 31, 2004, if it gives Licensor written notice of its intent to do so during February 2003, and (ii) Licensee may terminate this Agreement at the end of any Fiscal Year thereafter, if it gives Licensor written notice of its intent to do so during February of the calendar year prior to termination.

3. Payments.

a. Royalty. Each Fiscal Year during the term of this Agreement, Licensee shall pay to Licensor as a royalty (the "Royalty") an amount equal to the greater of (i) the minimum guaranteed royalty applicable to such Fiscal Year, as set forth in Section 3c below ("Minimum Guaranteed Royalty"), or (ii) two percent (2%) of Licensee's Net Sales (as defined in Section 3b below) of Merchandise during such Fiscal Year, on sales up to $300,000,000, one and one-half percent (1½%) of Licensee's Net Sales of Merchandise during such Fiscal Year on sales greater than $300,000,000 and up to $700,000,000, eight-tenths of one percent (.8%) of Licensee's Net Sales of Merchandise during such Fiscal Year on sales greater than $700,000,000 and up to $1,000,000,000, and seven-tenths of one percent (.7%) of Licensee's Net Sales of Merchandise during such Fiscal Year on sales greater than $1,000,000,000.

b. Net Sales. The term "Net Sales" as used herein shall mean the gross sales price to customers of all sales of Merchandise (whether regular, markdown, clearance or otherwise), excluding sales tax and finance charges and less returns of Merchandise. No other deductions shall be taken.



TL 28131

4R

c. Minimum Guaranteed Royalties. The Minimum Guaranteed Royalties shall be as set forth below:

| FISCAL YEAR | MINIMUM GUARANTEED ROYALTY |
|---|---|
| 2/01/98 - 1/30/99 | $ 9,000,000 |
| 1/31/99 - 1/29/00 | $ 9,000,000 |
| 1/30/00 - 2/03/01 | $10,500,000 |
| 2/04/01 - 2/02/02 | $10,500,000 |
| 2/03/02 - 2/01/03 | $10,500,000 |
| 2/02/03 - 1/31/04 | $10,500,000 |

4. **Manner of Payment.**

a. Quarterly Payment. Not later than the tenth (10th) day after the end of each and every fiscal quarter, beginning with the first fiscal quarter of 1998, Licensee shall pay and deliver to Licensor an amount equal to the greater of (i) twenty five percent (25%) of the Minimum Guaranteed Royalty applicable to the then current Fiscal Year, or (ii) the applicable Royalty percentage (2%, 1 1/2%, .8% or .7% or combinations thereof as the case may be, on a cumulative basis, as set forth in Section 3a above) multiplied by its Net Sales in the immediately previous fiscal quarter (the applicable royalty).

b. Prompt Delivery. Licensee acknowledges and agrees that the timely delivery of the payments required by Section 4a and the Quarterly Reports and Sales Reports required by Section 5 hereof are essential to this Agreement. Interest shall accrue on all past due payments hereunder from their respective due dates until paid at the rate of one percent (1%) per month, or if such rate exceeds the maximum rate allowed by law, at the maximum rate allowed by law, and shall be payable on demand.

5. **Reports, Record Keeping and Audits**

a. Maintenance of Records. Licensee shall keep books of account and records in accordance with generally accepted accounting principles, consistently applied, covering all sales relating to this Agreement and the license hereby granted. Such records shall be maintained for at least two (2) years after the quarter to which such records relate.

b. Quarterly Reports. Every Royalty payment pursuant to Section 4a shall be accompanied by a written report (individually, the "Quarterly Report" and collectively, the "Quarterly Reports") as to:

(i) The quantity, description and sales price of all Merchandise sold by Licensee during the quarter to which such Royalty relates;

(ii) The aggregate gross sales of all Merchandise and the Net Sales of Merchandise, year to date, and the Net Sales of Merchandise for such quarter;

(iii) Any other related information that may be reasonably requested by Licensor.

c. Sales Reports. In addition, Licensee shall provide Licensor with weekly sales recap reports and seasonal sales projections as developed and revised (collectively, the "Sales Reports"); provided, however, that all such Sales Reports shall be in the form and format used by Licensee in the ordinary course of business.

d. Audit. Licensor and its duly authorized representatives shall have the right upon reasonable notice and at all reasonable hours during normal business days to examine and copy such books of account and records and all other documents and materials in the possession or under the control of Licensee with respect to the subject matter and the terms of this Agreement, the cost of which shall be borne by Licensor. Licensor shall not conduct an audit more than once with respect to any Fiscal Year, and in no event shall such audit be during Licensee's fourth fiscal quarter. If the audit discloses that the Royalty payments actually due exceed the Royalty payments paid, Licensee shall pay the unpaid Royalty and interest on such unpaid Royalty payments computed from the date such Royalty payments were due, accrued at the rate of one percent (1%) per month, or if such rate exceeds the maximum rate allowed by law, at such maximum legal rate. If the audit discloses that the Royalty payments made by Licensee exceed the Royalty payments due, Licensor shall reimburse Licensee in the amount the overpaid Royalty and interest on such overpayment, computed from the date such Royalty payments were made, accrued at the rate of one percent (1%) per month. In addition, if the audit discloses that the Royalty payments actually due exceed the Royalty payments paid by an amount greater than five percent (5%) of the Royalty payments paid, the cost of the audit performed by Licensor shall be paid by Licensee.

e. Financial Statements. If, at any time during the Initial Term, Licensee is no longer a company required to provide public financial information pursuant to the Securities and Exchange Commission reporting requirements, Licensee shall, upon reasonable request of Licensor, and from time to time thereafter, provide Licensor with interim and audited annual financial statements.

6. Standards of Quality

a. Standards and Prestige of Merchandise. Licensee acknowledges that the Trademark has established prestige and goodwill and is well recognized in the minds of the public, and that it is of great importance to each party that in the manufacture and sale of the Merchandise the high standards and reputation that Licensor has established be maintained. Accordingly, all items of Merchandise manufactured or caused to be manufactured by Licensee hereunder and any other expression by Licensee, which by its nature conveys to others the existence of a relationship between the Licensee and the Trademark, including, without limitation, all packaging, labeling, fixturing, advertising, point-of-sale materials and product literature (any such expression as herein referred to as "Trademark Use Materials") shall (i) in the case of apparel Merchandise, be of a quality at least as high as the "middle" line of similar products being sold by Licensee at the time of execution of this Agreement (i.e. Licensee's HONORS® brand products), and (ii) in the case of non-apparel Merchandise, be of a quality at least as high as the standard set forth in Licensee's quality control standards and procedures for such non-apparel Merchandise. From time to time during the Term of this Agreement, and as Licensor reasonably requests, so as not to disrupt the ongoing business processes of Licensee, Licensee shall supply Licensor or a designee of Licensor with a reasonable assortment of samples of Merchandise (including samples of labeling and packaging used in connection therewith). Further, at all times during the Term hereof, and upon Licensor's prior request, Licensee shall make its manufacturing facilities available to Licensor at mutually satisfactory times, and shall use its reasonable efforts to make available each contractor's manufacturing facilities for inspection by Licensor's representatives during usual working hours. In addition, Licensee shall supply Licensor or a designee of Licensor with samples of its logo designs and formats for use of the Trademark in connection with labels and packaging materials. Upon receipt of such designs and formats, Licensor shall have ten (10) business days in which to review and approve those materials, which approval shall not be unreasonably withheld. Thereafter, all uses of the Trademarks by Licensee in connection with labels and packaging materials shall conform in all materials respects with the approved designs and formats and Licensee shall have no obligation to provide samples of such materials for review or approval by Licensor, as long as the approved designs and formats remain unchanged. If Licensor shall not have indicated approval of any such materials within seven (7) business days, Licensee shall contact Licensor regarding such approval, and Licensor shall have three (3) additional days in which to review and approve the materials. If Licensor shall not have indicated approval of any such materials in the said three (3) additional days, then the Materials shall be deemed to have been approved. Licensee shall sell or otherwise dispose of miscuts or damaged Merchandise only after Licensee has cut out the labels or any other item that identifies the Merchandise with the Trademark.

b. Standards and Procedures. Concurrently with execution of this Agreement, and not more than once each Fiscal Year thereafter, upon the request of Licensor, Licensee shall provide Licensor with a written copy of Licensee's quality control standards and procedures, and Licensor shall, upon the request of Licensee, provide Licensee with a written copy of Licensor' s Quality Control Standards which apply to Licensor' s other licensees. At Licensee's request, Licensor and Licensee will meet annually before Licensor's Quality Control Standards are established for such year and Licensee shall have the right to approve such standards and procedures, including, without limitation, the quality standards to be applied to retail drug store license agreements for cosmetics, if any, before they are implemented; provided, however, that such Quality Control Standards shall be consistent with the quality standard set forth in Section 6a hereinabove.

7. **Protection of Trademark**

a. Acknowledgments and Agreements of Licensee. As a material inducement to Licensor to enter into this Agreement, and as a material part of the consideration to Licensor hereunder, Licensee hereby acknowledges and agrees that:

(i) (a) Licensor owns the Trademark in various countries worldwide, and all rights, registrations, applications and filings with respect to such Trademark, and all renewals and extensions of any such registrations, applications and filings, (b) Licensor has the right to license the Trademark, and (c) Licensee is acquiring hereby only the right to use the Trademark for the purpose stated in and pursuant to the terms and conditions of the Agreement.

(ii) (a) Great value is placed on the Trademark, and the goodwill associated therewith, (b) the Trademark and all rights therein and goodwill pertaining thereto belong exclusively to Licensor, and (c) all authorized use of the Trademark by Licensee shall inure to the benefit of Licensor.

(iii) The conditions, terms, restrictions, covenants and limitations of this Agreement are necessary, equitable, reasonable and essential to assure the consuming public that all goods sold under the Trademark are of the same consistently high quality as sold by Licensor and by others who are licensed to design, manufacture and/or sell any products by, under or with the Trademark, if any.

b. Protection of Rights.

(i) Restriction on Use. Licensee shall not use or permit the use of the Trademark for any purpose or use other than the uses licensed under this Agreement.

(ii) General. Licensee shall cooperate fully and in good faith with Licensor for the purpose of securing and preserving Licensor' s (or any grantee of Licensor's) rights in and to the Trademark. Licensee shall cause to appear on and in connection with the Merchandise and the Trademark Use Materials the ® or ™ as applicable.

(iii) Registration. Licensee shall, upon request, supply to Licensor enough specimens of advertisements, tags, labels and other use of the Trademark as may be required in connection with any of Licensor's Trademark applications or registrations. Licensee shall execute any instrument Licensor shall reasonably deem necessary or desirable to record or cancel Licensee as a registered user of the Trademark, it being understood and agreed that Licensee's right to use the Trademark in the event that the filing of a registered user application is required or is requested by Licensor shall commence only upon the filing of such registered user application, and shall continue only so long as this Agreement remains in effect.

(iv) Customer Complaints. Licensee shall, in connection with its duty to use the Trademark so as to promote the continuing goodwill thereof, give immediate attention and take necessary action to satisfy all legitimate customer complaints brought against Licensee in connection with the Merchandise or the Stores. Licensee shall give Licensor immediate written notice of all complaints that in Licensee's opinion are likely to result in litigation. Licensee shall cooperate with Licensor upon request to achieve as good a reputation and press for the Trademark as possible.

(v) Exclusivity. Licensor agrees that during the term of this Agreement it will not license the Trademark, and/or renew or otherwise extend existing license agreements between Licensor and any third party(ies), in the United States, in any merchandise category whatsoever; excluding, however, the following:

(a) Retail license agreements with Brylane, Caldor and/or Pamida, which may be extended, on the terms in force as of the date of signing of this Agreement, as long as such agreements are not extended beyond January 31, 2002, without the prior written consent of Licensee, which

may be granted or withheld at Licensee's sole option. In the event that Licensee does not consent to extension of the agreements beyond January 31, 2002, the categories that are subject of such agreements will become part of Licensee's exclusive categories. In the event that Licensee consents to extension of the agreements beyond January 31, 2002, Licensor shall pay and deliver to Licensee, not later than the tenth (10th) day after the end of each and every fiscal quarter, beginning with the first fiscal quarter of 2002, fifty percent (50%) of all royalties earned by Licensor from Brylane, Caldor and/or Pamida in connection with such agreements.

(b) Retail license agreements with certain drug stores chains, as set forth and defined in Exhibit B hereto (in the category of cosmetics, bath and body products only).

(c) Wholesale license agreements with Bueno Handbags (in the category of handbags, only), Golden State Watches (in the category of watches only) and/or Outlook/Creative Optics (in the category of sunglasses/eyeglasses only), which may be extended, for the same categories of merchandise as long as (i) such agreements are not extended beyond January 31, 2002, without the prior written consent of Licensee, which may be granted or withheld at Licensee's sole option, and (ii) any extension specifically prohibits the sale of merchandise by such wholesale licensees to any mass merchandising discount store, wholesale club, midtier store and/or value discounter (with the exception of Caldor and Pamida). The categories that are the subject of such agreements will become part of Licensee's exclusive categories if such agreements are not extended.

8. <u>Defaults and Remedies</u>.

a. <u>Defaults by Licensee.</u> The occurrence of any one or more of the following shall constitute a default by Licensee under this Agreement:

(i) Licensee shall fail to make any payment, submit any Quarterly Report or provide any financial information required under this Agreement when due, and such failure continues for more than thirty (30) days after written notice thereof, unless such failure cannot be cured within such thirty (30) day period and Licensee shall have commenced to cure the failure and proceeds diligently thereafter to cure such failure.

(ii) Licensee uses the Trademark in any manner likely to endanger the validity of the Trademark or to damage or impair the reputation or value of the Trademark, and such action continues for more than thirty (30)

days after written notice thereof, unless the action cannot be cured within such thirty (30) day period and Licensee shall have commenced to cure the action and proceeds diligently thereafter to cure such action.

(iii) The failure of Licensee to perform any of its other material obligations under this Agreement and such failure continues for more than thirty (30) days after written notice thereof, unless the failure cannot be cured within such thirty (30) day period and Licensee shall have commenced to cure the failure and proceeds diligently thereafter to cure such failure.

b. Default by Licensor. If Licensor fails to perform any of its material obligations under this Agreement and such failure continues for more than thirty (30) days after the written notice thereof, such failure shall constitute a failure by Licensor under this Agreement, unless the failure cannot be cured within such thirty (30) day-period and Licensor shall have commenced to cure such failure and proceeds diligently thereafter to cure such failure.

c. Remedies

(i) If Licensee has not cured any such breach or non-performance in accordance with Section 8a above, in addition to all other rights and remedies available to Licensor, whether pursuant to the terms of this Agreement at law in equity or otherwise, Licensor shall have the right to terminate this Agreement without further notice to Licensee and all unpaid Minimum Guaranteed Royalty payments due and owing under this Agreement, shall be immediately due and payable.

(ii) If Licensor has not cured any such breach or non-performance in accordance with Section 8b above, in addition to all of the other rights and remedies available to Licensee, whether pursuant to the terms of this Agreement at law, in equity or otherwise, Licensee shall have the right to terminate this Agreement without further notice to Licensor.

d. Effect of Expiration or Termination. Except as specifically provided herein to the contrary, upon expiration or termination of this Agreement, the rights and licenses granted herein shall terminate and Licensee shall have no further right to use the Trademark in connection with the Merchandise or the Trademark Use Materials. Upon the request of Licensor, Licensee shall immediately execute without further consideration such assignments and other instruments which may be required to be recorded to effect the termination of the licenses and rights granted herein (and the assignments of Licensee's rights to Licensor). Within twenty (20) days of the expiration or termination of this Agreement, Licensee shall deliver to Licensor all unpaid Royalties together with a final Quarterly Report covering all sales of Merchandise from the end of the period covered by

the preceding Quarterly Report through the date of expiration or termination of this Agreement,

e. Merchandise and Trademark Use Materials. Within one hundred and twenty (120) days of the expiration or termination of this Agreement, Licensee shall, at its sole expense, (i) remove or obliterate the Trademark from all Merchandise and Trademark Use Materials from which the Trademark can be removed or obliterated, and (ii) either destroy or deliver to Licensor all Merchandise and Trademark Use Materials from which the Trademark cannot be removed or obliterated.

f. Assignments. Neither this Agreement nor any of the rights or duties hereunder nor the license granted hereby may be assigned, sub-licensed, encumbered or otherwise transferred in any way by Licensee, without the prior written consent and agreement of the Licensor. Any purported assignment, sub-license, encumbrance or other transfer, whether voluntary or involuntary by operation of law or otherwise, shall be null and void and shall constitute a default hereunder by Licensee. Notwithstanding the foregoing, Licensee hereby consents and agrees (i) to the transfer or assignment of this Agreement (and related Trademarks), including any and all rights or duties of Licensor hereunder or thereunder, or in connection herewith, by Licensor to a different entity, including a "bankruptcy remote" special purpose entity ("SPE"), (ii) to the assignment and pledging of rights (and related Trademarks) of the Licensor under this Agreement to investors as collateral in a financing or securitization transaction, (iii) to make payments under this Agreement to a designated controlled account, and (iv) to furnish information and take such other measures (at no material cost or disruption to Licensee) which are reasonably requested by Licensor to facilitate the proposed financing or securitization. In the event of a transfer or assignment of this Agreement to a successor licensor hereunder, Licensor shall no longer mean Cherokee Inc. but its successor licensor; provided, however, that once a transfer or assignment is made pursuant to the clauses (i) and (ii) above, any subsequent assignment or transfer to successor licensor hereunder, including, but not limited to, any sale or transfer of equity ownership in the SPE, may only be made with the written approval of Licensee, which approval shall not be unreasonably withheld.

g. Contracts. Licensee shall have the right to contract the manufacture of the Merchandise and the Trademark Use Materials bearing the Trademark to third party manufacturers, so long as (i) each such contractor shall sign and return a Manufacturer's Trademark Agreement, in substantially the form attached hereto as Exhibit C, (ii) each such contractor shall be subject to the inspection and quality control procedures set forth herein, and (iii) the Merchandise and Trademark Use Materials meet the quality standards set forth in this Agreement.

9. Warranties.

a. Licensor warrants and represents that Licensor (i) is free to enter into this Agreement, (ii) has the full power, right and authority to make the grant of rights to Licensee as provided hereunder and that the exercise by Licensee of such rights, as authorized hereunder, shall not violate the rights of any third party, and (iii) is not subject to any obligation which will or might hinder or prevent the full completion and performance by Licensor of any of the covenants and the conditions to be kept and performed by Licensor hereunder.

b. Licensee hereby represents and warrants that Licensee (i) is free to enter into this Agreement, (ii) is not subject to any obligation which will or might hinder or prevent the full completion and performance by Licensee of any of the covenants and conditions to be kept and performed by Licensee hereunder, and (iii) will ensure that all uses of the Trademark and Trademark Use Materials comply with the terms of this Agreement.

10. Indemnification and Insurance.

a. Indemnification of Licensor. Licensee shall indemnify and hold Licensor and its affiliates, directors, officers, employees and agents harmless from and against any and all liabilities, losses, claims, suits, damages, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) arising out of or otherwise relating to any claims of third parties against the Licensor involving the design, manufacture, packaging, distribution, promotion, sale, marketing, advertising or other use of the Trademark, the Merchandise or the Trademark Use Materials, by Licensee and/or its contractors, provided that (i) prompt written notice is given to Licensee, upon Licensor becoming aware of any such actual or threatened claims or suits, (ii) Licensee shall have the option to exclusively undertake and conduct the defense and/or settlement of any such claims or suits, (iii) Licensor acts, with the prior consent of Licensee, to mitigate any damages, and (iv) no settlement or attempt at settlement of any such claims or suits is made without the prior written consent of Licensee. Licensee acknowledges that this indemnity does not include those items for which Licensor is indemnifying Licensee in Section 10b or 10c below.

b. Limitation on Indemnification of Licensor. The foregoing notwithstanding, it is hereby acknowledged that the Parties desire to participate in establishing common law usage of the Cherokee name in the cosmetics, bath and body category, but cannot anticipate what issues, if any, may be raised in that regard. As such Licensor shall defend, indemnify and hold Licensee and its affiliates, directors, officers, employees, and agents harmless, from and against any and all liabilities, losses, claims, suits, damages, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) which may be sustained or suffered by

or secured against Licensee based upon or arising out of any actual or alleged trademark infringement, unfair competition or infringement of similar proprietary rights, arising solely out of establishing common law usage of the Cherokee name in connection with such goods. The indemnification period will commence upon signing of this Agreement and will extend six (6) months after the date goods are first offered for sale in connection with the use of the Cherokee name in the cosmetics, bath and body category. In the event that Licensor obtains a federal trademark registration of the Cherokee name for the cosmetics, bath and body category, the provisions of § 10c below shall apply from the date of registration.

c. Indemnification of Licensee. Licensor shall defend, indemnify and hold Licensee and its affiliates, directors, officers, employees and agents harmless from and against any and all liabilities, losses, claims, suits, damages, costs and expenses (including, without limitation, reasonable attorney's fees and expenses) which may be sustained or suffered by or secured against Licensee based upon or arising out of any actual or alleged trademark infringement, unfair competition or infringement of similar proprietary rights, arising solely out of the use by Licensee and/or its contractors of the Trademark as authorized in this Agreement, provided that (i) prompt written notice is given to Licensor, upon Licensee becoming aware of any such actual or threatened claims or suits, (ii) Licensor shall have the option to exclusively undertake and conduct the defense and/or settlement of any such claims or suits, (iii) Licensee acts, with the prior consent of Licensor, to mitigate any damages, and (iv) no settlement or attempt at settlement of any such claims or suits is made without the prior written consent of Licensor.

d. Insurance. Licensee shall obtain and maintain throughout the term of this Agreement, at its own expense, general liability insurance and product liability insurance, with a responsible insurance carrier or carriers acceptable to Licensor, providing adequate protection (at least in the amount of $1,000,000 single limits for personal injury or property damage) and naming Licensor as an additional insured. As soon as possible after the execution of this Agreement, Licensee shall deliver to Licensor a fully paid certificate or certificates of insurance, naming Licensor as an additional insured, and providing that such policy or policies are cancelable only after thirty (30) days prior written notice to Licensor. No changes shall be made in such policy or policies of insurance that affect Licensor without written notice of such changes being given to Licensor.

11. Confidentiality.

Licensor acknowledges and agrees that any and all reports and financial information disclosed by Licensee pursuant to this Agreement is confidential information commercially valuable to Licensee (hereinafter the "Licensee Information"). Licensor acknowledges that the Licensee Information is disclosed to Licensor on a confidential

basis to be used only as may be expressly permitted by the terms and conditions of this Agreement. Licensor, its officers, directors, employees, and agents shall protect the Licensee Information as the confidential information and property of Licensee. Licensor shall not disclose any Licensee Information to any other person, firm, organization, or employee who is not authorized, in writing, by Licensee. Except as expressly permitted hereunder, the Licensee Information may not be copied, reprinted, duplicated, or recreated in whole or in part without the express written consent of Licensee. Licensor shall take reasonable action by instruction, agreement or otherwise with respect to Licensor's employees or other persons permitted to access the Licensee Information to comply fully with Licensor's obligations hereto with respect to the use, copying, protection, and security of the Licensee Information. Licensor agrees to return the Licensee Information, and all copies thereof, to Licensee, upon request. Licensee hereby consents to the disclosure of the License Information to any of the Licensor's attorneys, accountants and other third parties who have a business "need to know" in connection with any financing or securitization.

12. <u>General Provisions.</u>

a. <u>Notices.</u> All notices and other communications required or permitted to be given under this Agreement shall be in writing and shall be delivered either by personal service, facsimile or by prepaid over-night courier service and addressed as follows:

**If To Licensor:**
Cherokee Inc.
6835 Valjean Avenue
Van Nuys, CA 91406
Attn: Chief Executive Officer
Fax: 818/908-9191

**With A Copy To:**
Latham & Watkins
633 West 5th Street
Suite 4000
Los Angeles, CA 90071
Attn: Robert Klyman
Fax: 213/891-8763

**If To Licensee:**
Target Stores
33 South 6th Street
Minneapolis, MN 55402
Attn: Executive Vice President Merchandising
Fax: 612/304-6325

**With Copies To:**
Target Stores
33 South Sixth Street
Minneapolis, MN 55402
Attn: Assistant General Counsel, General Business
Fax: 612/ 304-8309
Attn: CFO, DHC
Fax: 612/370-6565
Attn: Senior VP Merchandising, Softlines
Fax: 612/304-3729

If delivered personally, such notices or other communications shall be deemed delivered upon delivery. If sent by fax, such notice or other communications shall be deemed delivered when received, provided that the sender has confirmation of receipt. If sent by prepaid over-night courier service, such notices or other communications shall be deemed delivered upon delivery or refusal to accept delivery as indicated on the return receipt. Either party may change its address at any time by written notice to the other party as set forth above.

b. Entire Agreement. This Agreement sets forth the entire agreement between the Parties with respect to the subject matter hereof, and all prior negotiations, discussions, commitments and/or understandings relating thereto, if any, are merged herein. Effective February 1, 1998, this Agreement shall supersede any and all other agreements and amendments between the Parties, bearing a date of November 11, 1997 or earlier, including, without limitation, that certain exclusive License Agreement between Licensor and Licensee dated August 15, 1995 as amended, and that certain non-exclusive License Agreement between Licensor and Licensee dated November 1, 1995 (and accompanying cover sheet), as amended, and may be modified only by a written agreement signed by duly authorized of each of the Parties. No representations, oral or otherwise expressed or implied, other than those specifically contained in this Agreement have been made by any party hereto. No other agreements not referred to or specifically contained herein, oral or otherwise, shall be deemed to exist or to bind any of the Parties hereto.

c. Successors and Assigns. This Agreement shall be binding upon and shall inure to the benefit of the successors and permitted assigns of the Parties.

d. Choice of Law. The validity, construction and enforcement of this Agreement shall be governed by the laws of the State of California without regard to its choice of law principles.

e. Dispute Resolution. Any claim or controversy arising out of or relating to this Agreement, or any breach thereof wherein only damages are sought, shall be settled by the appointment of a retired judge of the Superior or Appellate Courts of California who shall act pursuant to Section 638.1 of the California Code of Civil Procedure "to try any and all of the issues in an action or proceeding, whether of fact or of law, and to report a state of decision thereon". The Parties stipulate to the use of the referenced procedure and agree that the Superior Court of Los Angeles County of the State of California may issue such orders as are necessary to implement the Parties intent that any such claim or controversy shall be resolved through the use of the referenced procedure. The decision reached by the referee shall be entered as a judgment of the Superior Court appointing the referee and such decisions shall be fully appealable. All fees and expenses of the

referee shall be initially borne on a pro rata basis by the Parties, but shall be recoverable by the prevailing party. Additionally; the prevailing party shall be entitled to recover, as an element of such party's cost of suit, and not as damages, all reasonable costs and expenses incurred or sustained by such prevailing party in connection with such actions including without limitation, legal fees and costs.

f. No Waiver. No waiver by either party, whether express or implied, of any provision of this Agreement or of any breach or default of any party, shall constitute a continuing waiver of such provision or any other provisions of this Agreement, and no such waiver by any party shall prevent such party from acting upon the same or any subsequent breach or default of the other party of the same or any other provision of this Agreement.

g. Disclaimer of Agency. Nothing in this Agreement shall create a partnership or joint venture or establish the relationship of principal and agent or any other relationship of a similar nature between the parties hereto, and neither Licensee nor Licensor shall have the power to obligate or bind the other in any manner whatsoever.

h. Construction. This Agreement shall be interpreted to provide Licensor with the maximum control of the Trademark and the use thereof.

i. Licensor Approvals. Any approval required from Licensor under this Agreement shall be effective and binding against Licensor only if it is in writing. Any approval required hereunder must be obtained by Licensee prior to Licensee taking any action which requires such approval.

j. Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

k. Authority. Each individual signing on behalf of a party hereto represents and warrants that he or she is authorized to execute this Agreement on behalf of such party.

l. Termination on Insolvency of Licensee. Licensor may terminate this Agreement if a petition for relief under applicable bankruptcy law is filed by or against Licensee, and is not dismissed within sixty (60) days of such filing, if Licensee makes any assignment for the benefit of its creditors, or if a receiver is appointed for Licensee for all or substantially are of its business interests.

The license and rights granted hereunder are personal to Licensee. No assignee for the benefit of creditors, receiver, debtor in possession, trustee in bankruptcy, sheriff or any other officer of court charged with taking over custody of



SRM

Licensee's assets or business shall have any right to continue performance to exploit or in any way use the Trademark if this Agreement is terminated, except as may be required by law.

m. <u>Termination on Insolvency of Licensor</u>. Licensee may terminate this Agreement, if a petition for relief under applicable bankruptcy law is filed by or against Licensor, and is not dismissed within sixty (60) days of such filing, if Licensor makes any assignment for the benefit of its creditors, or if a receiver is appointed for Licensor for all or substantially all of its business interests.

In the event of such termination, Licensee shall have the right to continue thereafter to import and/or sell any and all Merchandise which Licensee has purchased, produced or committed to purchase prior to the date of termination.

n. <u>Non-Disclosure of Terms</u>. The existence and content of this Agreement are confidential and are trade secrets, and shall not be released in whole or in part to any third party, or disclosed to any newspaper or other public medium, or in any other fashion whatsoever, without the mutual, prior approval of the Parties, in their sole discretion; except that any party shall have the right to make such disclosures as required by law or court order, or on a "need to know" basis within their respective organizations and related, affiliated and subsidiary companies, and to their respective accounts and attorneys.

The provisions of this Section 12 shall survive the expiration or sooner termination of this Agreement.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the 12th day of November, 1997

**DAYTON HUDSON CORPORATION**

By: [signature]
Gregg Steinhafel
Executive Vice President, Marketing

**CHEROKEE, INC.**

By: [signature]
Robert Margolis
Chief Executive Officer

TL 28131



GS RM