UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

MAG JEWELRY CO., INC. :
:
Plaintiff :
:
VS. : C.A. NO.: 04-174T
:
CHEROKEE, INC., ROBERT MARGOLIS :
AND TARGET CORPORATION d/b/a :
TARGET STORES and STYLE
ACCESSORIES, INC. :
:
Defendants :

**PLAINTIFF'S RULE 12.1(2) STATEMENT IN OPPOSITION TO DEFENDANT, STYLE ACCESSORIES, INC.'S, MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 12.1(2) of the local Rules of this Court, Plaintiff, Mag Jewelry Co., Inc., sets forth below the following facts as to which there is a genuine issue of material fact in dispute, which precludes Summary Judgment for the Defendant, Style Accessories, Inc.:

1. The Mag Crystal Angel is a unique creation and design, in that it is an expression of an angel through the use of four (4) crystal stones of various shape and size, with a jump ring to represent a halo. (Opinion Report of Donald Donnelly attached hereto is Exhibit "1".)

2. The Crystal Angel design possesses the required minimum degree of creativity because it was granted a Registration after examination by the U.S. Copyright Office. The fact that other crystal angel designs may exist in no way weakens or destroys the validity of the Plaintiff's copyright. To the contrary, as the originator of its copyrighted design, Mag is

entitled to protection for its artistic expression of a crystal angel. (Opinion of Elliot Salter, Esq. attached hereto, Exhibit "2")

3. The Mag Crystal Angel is a unique and novel design, which had not been introduced by any other jewelry manufacturer and/or designer in the jewelry industry, prior to March 1992, when Daniel Magnanimi first designed and created the piece. (Exhibit "1")

4. Mag's President and several employees signed a document evidencing creation of the crystal angel piece and dated it June 1, 1995 because Daniel Magnanimi was under the erroneous impression that said document was required to be dated the same date as the date of preparation and execution thereof. (Affidavit of D. Magnanimi, attached hereto, as Exhibit "3", see also Depo. Tr. of D. Magnanimi, pp. 75-79, relevant portions of which are attached as Exhibit "4"; Depo. Tr. of D. Donnelly, pp. 90-94, relevant portions of which are attached asattached as Exhibit "5")

5. Alan Gregerman did not independently create his crystal angel in mid1994. In September 1996, Mag and Gregerman entered into a license agreement whereby they permitted each other to market and sell the angels to their own customers. (Exhibit "6")

6. The publication date of June 1, 1995 was placed on the initial application for copyright registration as a result of Mag's incorrect belief that the copyright and the crystal angel could only date back to the date the document evidencing creation was prepared and signed. After learning from its copyright attorney that this belief was mistaken, Mag filed a corrective supplemental registration, which sets forth the correct date of first publication of March 5, 1992. (Affidavit of D. Magnanimi, Exhibit "3")

7. The crystal angel piece Style Accessories, Inc. sold to Target Stores was obtained from Alan Gregerman. Said piece is not an adaptation of Mag's Crystal Angel, but rather, an identical piece to Mag's Crystal Angel, which was sold by Alan Gregerman pursuant to the License Agreement with Mag Jewelry. (Answers to Interrogatories #7,8 and 9 of Style Accessories, Inc. attached and marked Exhibit "7" and Exhibit "6")

8. After examining a sample of Mag's copyrighted work and a sample of the Defendant, Style Accessories, Inc.'s, accused piece, the matter meets the substantial similarity required to establish copyright infringement. (Opinion Report of Elliot Salter, Esq., Exhibit "2")

9. Alan Gregerman has never challenged the validity of Mag's copyright registration in the Crystal Angel jewelry piece. (Affidavit D. Magnanimi, Exhibit "3")

10. The Cease and Desist Orders forwarded to companies and individuals who were selling similar crystal angels to Mag's copyrighted piece refer to the date of June 1, 1995 as the date for completion of the design of the Crystal Angel erroneously. Mag believed that it could only date back to the date that the document was prepared and signed and not the actual date of first creation. After learning from its copyright attorney that this belief was mistaken, Mag filed a corrective Supplemental Registration which sets forth the correct date of first publication of March 5, 1992. All subsequent Cease and Desist Orders included the corrective date of March 5, 1992 as the date of first creation and publication. (Affidavit of D. Magnanimi, Exhibit "3")

11. Mag first published, i.e. displayed its Crystal Angel, in February 1992, when it included it in its line of jewelry at the United Jewelry Show in Providence, Rhode Island. (Affidavits of D. Magnanimi and D. Donnelly, Exhibits "3" and "8"; Depo. Tr. D. Donnelly, pp. 53-54 & 57, relevant portions of which are attached and marked Exhibit "9")

12. Mag's first shipment of samples of the Crystal Angel took place in September 1994 to a company known as Merlite located in New York. The purchase orders related to said shipment identify the Crystal Angel by its product number 948 and/or AB948. (Affidavit of D. Donnelly, Exhibit "8"; Purchase Order, dated 9/12/94, attached and marked Exhibit "10"; Depo. Tr. D. Magnanimi, pp. 57-60, relevant portions of which are attached and marked Exhibit "11"; Depo. Tr. D. Donnelly, pp. 61-62 & 78, relevant portions of which are attached and marked Exhibit "12")

13. Catalog Ventures is a customer of Mag Jewelry Co., Inc. Robert Piro of Catalog Ventures attended Mag's showroom at the Biltmore Hotel in Providence, Rhode Island in March 1992 when the Crystal Angel was first displayed by Mag. (Affidavit of Donald Donnelly, Exhibit "8" and Exhibit "13").

14. Nicholas Verecchia did not design essentially the same Crystal Angel in 1978 or 1979. Verrechia's employer, Joseph Bordieri of Empire Jewelry stated that he never created a crystal angel jewelry design while working for him nor did such a design exist in Empire Jewelry's line. (Exhibit "14")

15. Bharat Dass did not create a crystal angel nearly identical to Mag's in 1989. To the extent, it can be established that Bharat Dass created a crystal angel prior to Mag's Crystal Angel. Dass assigned all of its interest in his design to Mag by an Agreement dated August 19, 1997. (Exhibit "15")

In addition, Plaintiff specifically disputes and objects to Paragraph 5 of the Defendant's Statement of Undisputed facts on the ground that said statements speak to the artistic elements of the Crystal Angel piece. The copyright registration issued by the Registrar of Copyrights is

prima facie evidence that the Crystal Angel has a sufficient level of creativity to entitle it to copyright protection.

Also Plaintiff specifically disputes and objects to Paragraphs 12, 14, 15, 16, 31, 34, 35, 36, 39, 40, 41, 42, 43 and 44 of the Defendant's Statement of Undisputed Facts, on the grounds that same present disputed issues of fact as the creation of the Crystal Angel piece by other individuals, who are not parties to this litigation.

Plaintiff,
By and Through Its Attorneys,

Thomas A. Tarro, III #2046
THE LAW FIRM OF THOMAS A. TARRO, III
The Summit East – Suite 330
300 Centerville Road
Warwick, Rhode Island 02886
(401) 737-7200
(401) 732-3362 (fax)

**CERTIFICATION**

I hereby certify that I mailed a copy of the above Rule 12.1(2) Statement regular mail on the 9th day of September, 2005 to:

Craig M. Scott, Esq.
DUFFY & SWEENEY, LTD.
One Turks Head Place, Suite 1200
Providence, RI 02903

Thomas R. Noel, Esq.
NOEL & GYORGY, LLP
50 South Main Street
Providence, RI 02903

**REPORT OF DONALD DONNELLY PURSUANT TO RULE 26 (a)(2)(B) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

1. My name is Donald Donnelly. I am a sales representative for Mag Jewelry Co., Inc. located at 838 Dyer Avenue, Cranston, Rhode Island 02920 and have been employed in said capacity for 16 years.

2. Prior to my employment with Mag Jewelry Co., Inc., I had been employed in various capacities in the jewelry industry from 1958 through 1988. Particularly, I had been involved in the import/export of crystal stones, beads and miscellaneous component parts used in the manufacture of jewelry. During those years, I worked directly with manufacturers of crystal stones, as well as those that manufactured jewelry using Swarovski, Austrian crystal, Jablonex, Preciosa and Czech crystal stones. The manufacturers that I dealt with were located in the United States and overseas.

3. Due to my experience in the jewelry industry, and particularly, within the area of religious jewelry, I have been asked by Plaintiff Mag Jewelry Co., Inc. to offer expert testimony in a lawsuit that has been brought by Mag Jewelry Co., Inc. against the Defendants, Target Corporation d/b/a Target Stores, Cherokee, Inc., Robert Margolis and Style Accessories, Inc., C.A. No. 04-174T concerning the infringement of Mag's copyrighted "Crystal Angel" jewelry piece.

4. Although I have been identified as an expert, on behalf of Mag Jewelry Co., Inc., in a number of prior lawsuits involving infringement of the "Crystal Angel" jewelry piece, I have never testified as an expert at trial, as all of the prior lawsuits settled prior to trial. However, I did give an expert deposition in the matter of <u>Mag Jewelry Co., Inc. v. Russ Berrie</u>, C.A. No. 01-383ML.

5. I am not receiving an additional fee for my expert services in this matter. The fact that I am an independent contractor for Mag Jewelry Co., Inc. has no bearing on my opinions to be offered in this matter. The decision to offer expert testimony in this matter was entirely voluntary, on my part.

6. As stated previously, I have never offered expert testimony at trial, with respect to the subject infringing angel; excepting my deposition in <u>Mag Jewelry Co., Inc. V. Russ Berrie Co. Inc.</u> I have not given any testimony as a

jewelry expert, in any other matter, within the preceding 4 years. I have not authored any works in the area of jewelry design.

7. My opinions in this matter are based on my extensive experience in the jewelry industry, as set forth above. I hold my opinions set forth herein to a reasonable degree of professional certainty.

8. I am familiar with Mag's "Crystal Angel" jewelry piece, as well as various other jewelry pieces depicting the figure of an angel, which I have observed throughout my years in the jewelry industry.

## OPINIONS

9. Mag's "Crystal Angel" piece is a unique and novel design.

10. The creation and design of the "Crystal Angel" by Daniel Magnanimi of Mag Jewelry Co., Inc. is unique in that it is an expression of an angel through the use of 4 crystal stones of various shape and size, with a jump ring to represent the halo.

11. In my experience in the jewelry industry since 1958, I had never seen an expression of an angel through the use of crystal stones, as designed by Mag Jewelry Co., Inc. at any time prior to the creation of the piece by Mag in and around March 1992.

12. No other jewelry manufacturer and/or designer had introduced an expression of an angel through the use of 4 crystal stones, as designed by Mag Jewelry Co., Inc. into the jewelry industry, prior to March 1992.

Donald Donnelly [signature]
Donald Donnelly

Dated: June 24, 2005

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| Mag Jewelry Co., Inc., | : | |
| Plaintiff, | : | |
| vs. | : | C.A. #04-174T |
| Cherokee, Inc., Robert Margolis, Target Corporation dba Target Stores, and Style Accessories, Inc. | : | |
| Defendants. | : | |

**EXPERT REPORT OF ELLIOT A. SALTER**

**1. Assignment**

I, Elliot A. Salter, have been retained by Plaintiff Mag Jewelry Co., Inc. to testify with respect to the validity of Plaintiff's Copyright Registrations #VA 758-661 and #VA 787-020 covering Plaintiff's Crystal Angel Design. I have also been asked to testify as to issues relating to the infringement of Plaintiff's aforesaid copyrights by Defendants. For my services as an expert witness in this matter, I am being compensated at an hourly rate of $300.00 per hour.

**2. Summary and Conclusions**

Copyright protects original works of authorship that are fixed in some physical form (17 U.S.C. 102[a]). As used in the copyright context, the term "original" means that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least a minimal degree of creativity. See *Feist Publications v. Rural Telephone Service Co.*, 499 U.S. 340 (1991). It should be noted, however, that in the *Feist* case, the Supreme Court made it abundantly clear that the requisite level of creativity for copyright is very low; even a slight amount of original authorship will suffice.

The question in this case is whether Plaintiff's Crystal Angel design, even though relatively simplistic, embodies the "slight amount of original authorship" required to establish the minimal degree of creativity necessary to support copyright protection. It is my firm opinion that this Crystal Angel design does possess the required minimal degree of creativity, and obviously the U.S. Copyright Office agrees with this position, because it granted registration to Plaintiff for its work without even questioning the degree of creativity thereof. In this connection, there is a statutory presumption of validity, see 17 U.S.C. 410(c). The fact that other crystal angel designs may exist in no way weakens or destroys the validity of Plaintiff's copyright. Quite to the contrary, as originator of its copyrighted design, Plaintiff is entitled to protection for its artistic expression of a crystal angel, and as aforestated, Plaintiff's design has been found to possess the required minimum degree of artistic expression required by the U.S. Copyright Office to support registration.

Because of the statutory presumption of validity that exists, the burden is on Defendants to prove that Plaintiff was not the author of its copyrighted design and/or that the design does not possess the required minimal degree of creativity.

After examining a sample of Plaintiff's copyrighted work and a sample of Defendants' accused product, it is my firm and unequivocal opinion that the "substantial similarity" required to establish copyright infringement exists in this situation. One has to only look at the two products to reach this conclusion. The question of whether Defendants' accused product was actually copied from Plaintiff's product is a factual issue that will be determined by the Court based on the evidence placed before it, although if Defendants had access to Plaintiff's work, as is thought to be the case here, then the burden is on Defendants to prove that no copying took place. Of course, it is not necessary that Defendants copied a piece actually manufactured by Plaintiff, i.e., if Defendants copied from a third party who had permission or license to produce the copyrighted design, infringement would still exist.

I hold my opinions in this matter to a reasonable degree of professional certainty.

### 3. Background and Qualifications

I am a graduate of Brown University (Class of 1946) with a Bachelor of Science Degree in Engineering. I received a Bachelor of Laws Degree from the George Washington University in 1952. I have been a member in good standing of the Bar of the District of Columbia since 1953 and a member in good standing of the Bar of the State of Rhode Island since 1954.

I worked as an Examiner in the U.S. Patent and Trademark Office from 1948 through 1953. I have been in private practice in Providence, Rhode Island since 1954 specializing in intellectual property matters including the preparation and prosecution of applications for copyright registration. During the years I have been in practice, I would estimate that I have prepared, filed and prosecuted well over 1,000 applications for copyright registration, many of which relate to jewelry products.

Since 1960 I have been the senior partner in the firm of Salter & Michaelson, whose offices are at 321 South Main Street, Providence, Rhode Island 02903. The firm specializes in intellectual property matters, including copyright matters. I am a member of the Boston Patent Law Association and the American Intellectual Property Law Association.

In 1980 I appeared in court and testified as an expert witness for the plaintiff in the case of *Transitron Electronic Corp. v. Hughes Aircraft Co.*, (DC Mass. 1980) 487 F.Supp. 885; 205 USPQ 799, which case involved alleged infringement of a utility patent.

In the year 2000, I was retained as an expert witness for the defendants in the case of *I.P. Lund Trading ApS and Kroin Incorporated v. Kohler Company and Robern, Inc.*, CA #97-19427 NG, which was then pending in the United States

District Court for the District of Massachusetts. This case, which involved alleged infringement of a design patent, is reported at 118 F.Supp.2d 92 (56 USPQ 1776). In that case I filed an Expert Witness Report and had my deposition taken.

Also in the year 2000, I was retained as an expert by the defendant in the case of *Aro-Sac, Inc. vs. Merchants Overseas, Inc.*, C.A. #99 424 L, which was then pending in the United States District Court for the District of Rhode Island. In that case I filed an Expert Witness Report, but I was never called to testify.

From time to time I have spoken on intellectual property matters, including copyright issues, at various Bar Association, Trade Association, and educational forums.

**4. Evidence Considered**

In preparing this Expert Report, I have reviewed the following materials:

a. Copies of Plaintiff's Copyright Registrations #VA 758-661 and #VA 787-020 and all communications with the Copyright Office in connection therewith.

b. A sample of Plaintiff's Crystal Angel design which is the subject of the above noted copyright registrations.

c. A sample of Defendants' accused crystal angel design.

Respectfully,

[signature]

Elliot A. Salter

Dated: June 24, 2005.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| MAG JEWELRY CO., INC. | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| VS. | : | C.A. NO.: 04-174T |
| | : | |
| CHEROKEE, INC., ROBERT MARGOLIS AND TARGET CORPORATION d/b/a TARGET STORES and STYLE ACCESSORIES, INC. | : | |
| | : | |
| Defendants | : | |

**AFFIDAVIT**

I, Daniel Magnanimi, under oath, do hereby state as follows:

1. I am the President, sole shareholder and an employee of Mag Jewelry Co., Inc., the Plaintiff in the subject litigation. I submit the following Affidavit in support of the Plaintiff's Objection to the Defendant, Style Accessories, Inc.'s Motion for Summary Judgment.

2. In my capacity as an employee of Mag Jewelry Co., Inc., I designed and created the "Crystal Angel" jewelry piece, which is the subject of the instant matter.

3. In January or February, 1992, I was designing new jewelry items, which were to be included in Mag's line to be shown at the United Jewelry Show in Providence, Rhode Island, beginning March 5, 1992.

4. I was working with a variety of crystal stones of various sizes, shapes and settings to create new angel designs, because Mag was having a lot of success with its sales of jewelry pieces depicting angels.

5. Over a period of several days (the exact dates of which I cannot recall), I assembled four (4) stones of various size, in a configuration which I believed represented an angel, consisting of the wings, body and head of an angel.

6. I ultimately selected a circular stone, a larger tear-shaped stone and two (2) nevet stones for wings. I assembled the nevet stones at a particular angle, which I believed gave the appearance of the angel's wings. I also selected a brass jump-ring, four (4) to (5) millimeters, in size, which I attached to the piece to represent the angel's halo.

7. I then attached a lapel pin to the piece, as well as a bail and chain, in order to show the piece as a necklace. I made a number of samples in both forms;.

8. When I was satisfied with the final creation and design, I included a sample of the "Crystal Angel" and breakdown of its component parts and costs in one of Mag Jewelry's production books. The "Crystal Angel" entry was made in the book, somewhere between January 28, 1992 and the end of February, 1992. The specific date is unknown. (A copy of the specific page depicting the "Crystal Angel", is attached to this affidavit.)

9. The "Crystal Angel" was first displayed to the public as part of the Mag Jewelry line, which was shown at the United Jewelry Show in Providence, Rhode Island at the Biltmore Hotel in March, 1992.

10. The "Crystal Angel" had been shown continuously as part of Mag's line at the Mag's showroom at the headquarters of the Jewelry Manufacturer's Association in the Biltmore Hotel in Providence, Rhode Island through 1999. Subsequently, it was shown continuously at Mag's showroom at the Davol Square in Providence, Rhode Island from 1999 to 2001. The piece was shown at the jewelry show held at Crowne Plaza Hotel in Warwick, Rhode Island in mid-September, 2002. The piece has also been shown throughout the country at various other jewelry shows continuously since March, 1992, to the present, as well as at Mag's showroom at its headquarters at 838 Dyer Avenue in Cranston, Rhode Island.

11. The "Crystal Angel" has been a very successful item for Mag Jewelry over the past years.

12. On or about November 29, 1995, Mag applied to the Registrar of Copyrights for a certificate of registration for the "Crystal Angel". The certificate was issued by the Register of Copyright, with an effective date of November 29, 1995 and bears Registration No. VA758-661.

13. With respect to the document referenced in the Defendant's Motion for Summary Judgment and dated June 1, 1995, that document was prepared by me at the time that I was submitting the "Crystal Angel" jewelry piece, along with the application for copyright registration to the United States Copyright Office. The date on that document does not represent the date that the piece was created by me, but, the date that the document was created and signed of June 1, 1995 based on my incorrect belief. I later learned from my copyright attorney that I could use the date

of first creation of the crystal angel piece, which resulted in the filing of an amended copyright registration setting forth the correct date of first publication of the piece of March 5, 1992 at the United Jewelry Show in Providence, Rhode Island.

14. A supplemental registration was filed with the Registrar of Copyrights by Mag on or about November 22, 1995, indicating the correct date of first publication of March 5, 1992. On or about June 13, 1996, a certificate was issued by the Registrar of Copyright with the effective date of June 13, 1996 and bearing Registration No. VA787-020.

15. I have expended substantial time, money and effort to protect the "Crystal Angel" and my original design and creation, including having to bring numerous copyright infringement lawsuits against a number of entities and businesses, which have been selling infringing copies Mag's copyrighted "Crystal Angel". All of these lawsuits have settled, with the exception of the pending lawsuit in the United States District Court for the District of Rhode Island.

16. The initial Cease and Desist Orders forwarded to companies and individuals who were selling crystal angels to Mag's copyrighted piece refer to the date of June 1, 1995, as the date for completion of the design of the crystal angel erroneously. I believed that it could only date back to the date that the document was prepared and signed and not the actual date of first creation. After learning from my copyright attorney that this belief was mistaken, Mag Jewelry filed a corrective supplemental registration which sets forth the correct date of first publication of March 5, 1992; which was the date of the United Jewelry Show in Providence,

Rhode Island. All subsequent Cease and Desist Orders included the corrected date as to the date of first creation and publication.

17. Mag disputes that Alan Gregerman independently created a similar crystal angel jewelry piece. Pursuant to a license agreement with Mag, Alan Gregerman manufactures and sells the crystal angel jewelry piece to his customers. Alan Gregerman has never challenged the validity of Mag's copyright registration in its crystal angel jewelry piece.

Further Affiant sayeth not.

Daniel Magnanimi

STATE OF RHODE ISLAND
COUNTY OF KENT

In Warwick in said County on the 8th day of September ,2005, before me personally appeared Daniel Magnanimi, each and all to me known, and known by me to be the party executing the foregoing instrument and he acknowledged said instrument, by him executed to be his free act and deed.

Notary Public
My Commission Expires: 11/04/05

FW 655 | #110

| | |
|---|---|
| Stone | 1000 |
| Stam | 1000 |
| Stam | 2000 |
| Stam | 900 |
| Solder | 3000 |
| Ring | 400 |
| Mail | 500 |
| Cloth | 150 |
| Plate | 1500 |
| W+S | 600 |
| Boxing | 400 |

1700

1000 Box #110

2700

Sell w/o Vac

3100

Pin

w/Vac

Neck #110 #3600

w/Vac 3900

2?5/17

him.
Q. So, you talked to him in June of '95, and then you got back to him in November of '95?
A. Correct. There could have been a phone call in between, but I don't remember that phone call.
Q. And who would put you in touch -- strike that. How did you know to contact Elliot Salter?
A. My attorney, Tom Tarro.
Q. I'm going to show you that document that you referred to, and what I'm going to do is use that, which was introduced as an exhibit at the last deposition. We'll work off of that so we don't have to mark a new one. I'm going to show you what's been marked as Exhibit 3-Freitas, F-R-E-I-T-A-S, and I'll tell you that that was marked at the deposition of Ms. Freitas a few weeks ago, ask you to look at that, and tell me if that was the document you were referring to a minute ago?
A. Yes, it is.
Q. Is that your handwriting on that document above the three witness signatures down below?
A. Yes, it is.
Q. Is it all your handwriting?
A. Yes, it is.



Q. Can you tell me why you filled that out?
A. After speaking to Elliot Salter, he told me that an item did not have to be copyrighted as long as you could prove that you were the original creator. That's why I filled this form out.
Q. Where did you get that form from?
A. I made it on my computer.
Q. You wrote that up yourself?
A. Yes.
Q. Were you following some other format or template?
A. No.
Q. So, is it your testimony that you did that right after talking to Mr. Salter the first time?
A. Within a day or two.
Q. So, you filled it out to record certain things about your design, your creation, correct?
A. Correct.
Q. Did you run that form by Mr. Salter or anyone else before you decided to fill it in?
A. No.
Q. Why did you include these elements, why did you write what you wrote here? You included a number of things, enclosed is a design designed by you; that you were an employee of the company on a certain day; the model was made by; on the date



of; why did you include those particular elements?
A. Because those are all the elements that I thought were important.
Q. And where did you arrive at that understanding at that time?
A. In my mind, I sat at a computer and made out what I felt as though was protection.
Q. Did you ever use that particular form for any other creation?
A. Maybe the Flower Pot Angel but I'm not sure.
Q. Why did you add witnesses to the bottom of the document?
A. Because I wanted them to witness my signature that I created the Crystal Angel.
Q. Any reason why these three specific people witnessed it?
A. These are probably the three people that I have most contact with daily, even today, Frank Vascera is my general manager, Don Donnelly is my salesman, and Martha is my right-hand girl, who does everything for me.
Q. And, what did you mean by the word witness when you included that word, witness, at the bottom?
A. They witnessed my signature on this piece of paper.



Q. You didn't intend that to mean that they witnessed that you created the piece?
A. No.
Q. You were attesting to that, right, on the document?
A. Yes.
Q. That you created it?
A. Yes.
Q. So, you were trying to record that it was your design, right?
A. Correct.
Q. You were trying to record that you made a model, correct?
A. I don't see the word model there -- yes.
Q. The model was made by Mag Jewelry Co.?
A. Yes.
Q. "For a cost of," is not filled in, do you remember why?
A. No cost, I did it myself.
Q. I'm sorry?
A. I did it myself.
Q. Meaning, the model, itself?
A. Yes.
Q. When we talk about model, are we referring to the early piece?

A. Yes, sometimes we send models out to be made and we charge the customer, and if we copyright it for them, we put a cost on there.
Q. But, in this case, it was the early piece you put together on your board, is that right?
A. Correct.
Q. Then, it says, "On the date of 6/1/95," do you see that?
A. Correct.
Q. Why did you put that date in?
A. That's the day I talked to Elliot, that's the day I thought I could copyright something, or do a design because I had spoken to Elliot.
Q. Did you think that you had to speak to a lawyer in order to get a copyright?
A. Yes, I did.
Q. You left the cost blank, why didn't you leave the date blank?
A. Because that's the day I spoke to Elliot Salter.
Q. Nothing in that document claims to state the date that you talked to a copyright attorney, right?
A. Correct.
Q. It says the model was made by Mag on the date of 6/1/95, right?



A. That's correct.
Q. Is it possible that you made a new model on that day?
A. No, it's not possible.
Q. Listed there is, angel lapel pin, and necklace, and earrings, do you see that?
A. Correct.
Q. So, that was accurate, too, right?
A. Yes.
Q. The three people that you had sign as witnesses, did you discuss with them at the time what you were asking them to sign?
A. No, I told them that I spoke to Elliot Salter, or, a copyright attorney, and that he told me that as long as I had proof that I made the piece, I didn't even have to have it copyrighted, and that's why I drew up this piece of paper.
Q. And what did you do with that piece of paper after this point, after June 1?
A. I can't tell you for sure because I don't know for sure, but I believe that we sent some letters out to customers, along with this piece of paper. I can't tell you for sure, I don't have any copies of it. But, I believe that before I went to my attorney and we started sending letters



out, that I sent letters out, myself, saying that the design was our design, stop making the item.
Q. You said a moment ago that, your customers, did you --
A. Not customers, people that were making the item.
Q. So, you think that you might have written some letters even before November of '95 -- I'm sorry, let me rephrase. You're saying that you don't have records, but you think you might have written letters from the company, itself?
A. I don't know if I wrote letters or if I notified people.
Q. Do you remember sending this form out to people?
A. No.
Q. I'll show you in a minute, I'm not trying to confuse you, but there's a series of letters from Mr. Tarro's office that went out to a number of entities or people --
A. This was not one.
Q. Just to be clear, do you have any memory of yourself sending this out to anybody, aside from your copyright counsel?
A. I can't remember.
Q. You brought it up a minute ago that you might have



done that?
A. You asked me if I can remember, I said I can't remember.
Q. So, you might have done that?
A. Can't remember.
Q. You raised it as a possibility?
A. Might have done it, okay.
Q. Do you recall, I started asking this a minute ago, the witnesses, did you discuss with the three people that witnessed the document what the document was?
A. I told them that it was to protect my design of the Crystal Angel.
Q. Did you tell them anything else aside from that?
A. No.
Q. Did they question you on what the document said?
A. No.
Q. None of them said, 'Wait, you didn't make this on June 1 of '95'?
A. No.
Q. None of them said, 'Wait, we made this three years earlier'?
A. No.
Q. So, at this point in time, June 1 of '95, you hadn't decided to apply for copyright

Page 90

MR. TARRO: Objection.
A. This says 1995, it was created, and I know it was created in '92 and I know I sold it in '94 and I know I sold a lot of it in March of '95. So, how could I sign a paper in June of '95 that we just made it that day? It didn't make any sense to me.
Q. So the later one that you signed, did that one reflect accurate dates?
MR. TARRO: Objection.
A. Yes.
Q. In fact, does this one reflect accurate information?
MR. TARRO: Objection.
A. The only thing that's accurate about it is the date of the witness of his signing.
Q. In other words --
A. In my opinion.
Q. In other words, you signed this on June 1st of '95?
A. Yes.
Q. And, in fact, Mr. Magnanimi signed it on that day?
A. Yes.
Q. You don't know if you read these dates prior to affixing your signature, is that what you're

Page 91

saying?
MR. TARRO: Objection.
A. The only thing I looked at was this and it was handed to me on June 1st and that's the day I signed it. I didn't read what transpired up here until afterwards because the situation arose. How could you be selling this thing like crazy in March of '95 and say it was created in June of '95? There's a discrepancy there.
Q. When Mr. Magnanimi asked you to sign this form, what did he tell you it was going to be used for?
MR. TARRO: Objection. Asked and answered.
A. Just the fact that he was in the process of copyrighting it and in the meantime he wanted something to show that he was making it or something to have that he had created it.
Q. So you knew that this was a statement as to the creation of the angel piece; correct?
MR. TARRO: Objection.
MR. NOEL: What's the basis of the objection?
MR. TARRO: He witnessed his signature, okay. You've asked him a number of times, you're asking him improper questions with regards to the

Page 92

contents of the document that he only witnessed the signature and indicated he didn't read it, all right? And what his interpretation is of that document at this time really isn't relevant.
MR. NOEL: Well, I disagree with all that but I'm going to keep asking questions about it because the document, to a certain extent, speaks for itself and I'm entitled to find out what this witness's understanding was at the time and what was said at the time.
MR. TARRO: And he has testified to that. You've asked him several times the same question and I am letting him answer it.
Q. You understood at the time that this document was to show that Mr. Magnanimi had in fact created the angel piece. Do we agree with that?
MR. TARRO: Objection. Objection.
Q. Is that right?
THE WITNESS: I don't know if I'm supposed to answer it.
MR. TARRO: You can answer.
A. Yes, yes.
Q. And you knew that it was part of the copyright registration process at the time; is that right?
MR. TARRO: Objection.

Page 93

A. I don't know that.
Q. What was your understanding as to what it was for?
MR. TARRO: Objection.
A. That it was going to be or something that he was going to apply a copyright for.
Q. But he told you about a conversation with Elliot Salter; correct?
MR. TARRO: Objection.
A. Right.
Q. Tell me what he told you about that conversation as best you can remember.
MR. TARRO: Objection.
A. That Elliot Salter told him in fact that he was a copyright attorney and that he would work on our behalf and that in the meantime a document could be drawn up and witnessed that the piece was, in fact, something that he had created. So, he proceeded to make a document or what he felt at that time was a document to protect someone infringing on what he had done. And the reason that he was doing that was because the item really became like the hottest item in the jewelry industry. We're in an item business and that item became -- like 39 people, I think, or 30 some-odd people bought that at a show. You've got

Page 94

something, you know. You've got an item that's going to go.

Once we shipped out the samples and orders started to come in, he said, I've got to get a copyright on this. That's all I remember.

Q. Then you knew it was for purposes of protecting what --

MR. TARRO: Objection.

A. His creation.

Q. -- what you had seen him create?

MR. TARRO: Objection.

A. Yes.

Q. This says this is an original design. The model was made by Mag Jewelry Co., for a cost of blank on the date of 6/1/95. Do you see that?

A. Yeah. I have seen it since then, yes. Stupid, isn't it?

Q. That wasn't accurate at the time you signed this?

MR. TARRO: Objection.

A. You know it wasn't.

Q. I'm asking you.

MR. TARRO: Objection. It's argumentative.

Q. That wasn't accurate at the time?

MR. TARRO: Objection. I'm instructing

Page 95

him not to answer.

MR. NOEL: Really.

MR. TARRO: Yeah, it's argumentative. He's asked and answered it. He told you he witnessed the signature, that's all he did. He told you it's an incorrect date.

MR. NOEL: Tom, you keep saying that all they did was witness the signature because that's your position in the litigation. The document says a whole lot more than that and he signed the document.

MR. TARRO: And you know, you know he didn't prepare the document. You know that he didn't attest to the facts of the document. As a lawyer, you know that.

MR. NOEL: No, I don't know that.

MR. TARRO: Well, you should know that.

MR. NOEL: It's up to the person who signed the document to tell us.

MR. TARRO: He didn't sign this document, he witnessed the signature. You know he witnessed the signature because it says he's a witness. He didn't prepare the document. He didn't sign the document as a document setting forth facts that are what he is stating to be true and accurate.

Page 96

MR. NOEL: Nevertheless, we have a document and I am going to ask questions about it.

MR. TARRO: You've asked him a number of times. For the past fifteen minutes you've asked questions about the same document repeatedly and he has answered them.

Q. Have you ever signed a document under oath?

MR. TARRO: Objection.

A. I'm not sure I know what that means actually.

Q. Have you ever signed mortgage papers for your house?

MR. TARRO: Objection.

A. I had a mortgage once but I don't remember if there was anything under oath.

Q. Do you know if you ever signed a voter registration card under oath?

MR. TARRO: Objection.

A. I signed a voter registration card every time I vote but I don't know it's being under oath. I just did under oath now but I'm probably not going to be -- I haven't signed my name on anything yet.

Q. You're not sure if you've ever signed a document under oath, is that what you're saying?

MR. TARRO: Objection.

A. That's what I'm saying.

Page 97

Q. Okay. What was your understanding at the time of how you're affixing your signature to this document would help protect Mr. Magnanimi in relation to his creation?

MR. TARRO: Objection.

A. I'm not -- we're not lawyers, we're people in the jewelry industry. If he told me that this is what he felt would protect him, then being as how I'm making a living with the man, I'm going to sign it. I don't know. I don't know anything about it other than what we understood. If we could in fact prove, but a lot of that we've learned since then. We didn't know -- if we had known, it's not done like this today. We do it completely different now and we've only learned through our mistakes like everyone else.

Q. You said a minute ago in that answer that if we could prove, if you could prove what?

MR. TARRO: Objection. I instruct him not to answer.

MR. NOEL: You're not going to answer that question?

THE WITNESS: I'm not sure I understand the question or if there was a question.

Q. You started saying a moment ago that you signed

To: Allan Gregerman Co.
231 Elm
Warwick, RI 02888
Att. Allan Gregerman

From: Danny Magnanimi
Mag Jewelry Co. Inc.

Date: 9/15/96

DEFENDANT'S EXHIBIT
GREGERMAN 6/19/97
NO. 8

Dear Allan,

Per our telephone conversation we have both agreed that you can make the crystal angel as copyrighted by Mag Jewelry Co..
You have been nice enough to call us with customers that have called you in looking to buy this item, and we have agreed with most of them. We feel that we know your customer base very well and that we will not try to chase them with both the pearl angel and the crystal angel with brass wings. As I stated on the phone, we will not try to sell the pearl angel to K & M or the crystal angel with the brass wings. If they call we will let you know.
We will be making both the crystal angel with the brass wings and the pearl angel if you cannot meet our delivery dates.

It is nice to know that there are still gentlemen in this business.
I feel that our business will only grow in the near future.

**Also please feel free to call us if you need any help in your delivery to your customers. <u>Let's both try to make some money this year.</u>**

Regards,

Danny Magnanimi

cc/Don Donnelly Sales
cc/Frank Vescera GM Mag Jewelry Co.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| MAG JEWELRY CO., INC.<br>Plaintiff | : | |
| vs. | : | C.A. No. 04-174T |
| CHEROKEE, INC., ROBERT MARGOLIS<br>TARGET CORPORATION D/B/A<br>TARGET STORES and STYLE<br>ACCESSORIES, INC.<br>Defendants | : | |

**DEFENDANT STYLE ACCESSORIES, INC.'s**
**ANSWERS TO PLAINTIFF'S INTERROGATORIES**

Defendant Style Accessories, Inc. ("Style") hereby answers and responds to Plaintiff's Interrogatories, as follows:

**INTERROGATORY NO. 1:** Please identify the person executing the answers to these interrogatories on behalf of Style Accessories, Inc., all titles and positions held by such person at any time and the date such person held each such title or position, and state such person's business address.

**ANSWER:** Chad R. Mollica, President, Style Accessories, Inc., 3 Acorn Street, Providence, Rhode Island. Mr. Mollica has held this position since approximately 1994.

**INTERROGATORY NO. 2:** Please state the names, addresses and titles or positions of each and every person, agent, servant or employee of Style Accessories, Inc. who has provided any knowledge or information or who has assisted in the formulation of the answers to theses interrogatories.

**ANSWER:** Chad R. Mollica; Ms. Susan Coppola, Vice President; Ms. Denise

Asselin, bookkeeper. All may be contacted through Style's litigation counsel.

**INTERROGATORY NO. 3:** With regard to the Defendant, Style Accessories, Inc., please state:

a. date of incorporation;

b. place of incorporation;

c. name, home address and business address of each officer;

d. name, home address and business address of each director;

e. number of shareholders;

f. name, home address and business address of each shareholder;

g. location of corporation (street address, city/town, state; and

h. the name and address of all facilities, including headquarters, manufacturing facilities, sale offices and showrooms.

**ANSWER:** Style objects to subparts (c), (d), (e) and (f) of this Interrogatory. The identities of the individuals sought in (c) and (d) are equally available to the plaintiff in public records. Seeking and addresses is not reasonably calculated to lead to the discovery of admissible evidence and is unnecessary, as all would be contacted, if at all, through Style's litigation counsel. The request for shareholder information is not reasonably calculated to lead to the discovery of admissible evidence and is unduly burdensome. Without waiving the Objection, and subject to it, Style answers as follows. Style was incorporated in Rhode Island in July 1994. Mr. Mollica owns approximately 60% of the common stock of Style; the remainder is owned by various family members and business associates. Style is located at 3 Acorn Street, Providence, and maintains a showroom at 389 Fifth Avenue, New York, New York.

**INTERROGATORY NO. 4:** Does this Defendant or any of its subdivisions or affiliates make, manufacture and/or sell any other jewelry piece, which depicts an angel and is composed of crystal stones? If so, please state:

a. a description of the jewelry piece;

b. the name and address of the person and/or entity from whom this Defendant purchased said piece;

c. the name and address of the manufacturer of said piece;

d. the total number of pieces sold by this Defendant;

e. the amount paid by this Defendant to its supplier for said pieces purchased to date;

f. the price at which this Defendant has sold said piece; and

g. the total number of said pieces this Defendant presently has in its inventory.

**ANSWER:** Style objects to this interrogatory as it is vague, overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. The reference to "*other* jewelry piece" is not defined. Assuming it is intended to refer to any piece other than the crystal angel piece depicted in the complaint, and without waiving the objection and subject to it, Style answers that it does not.

**INTERROGATORY NO. 5:** With respect to the "Crystal Angel" jewelry piece sold by the Defendants, which is the subject matter of the pending lawsuit, please state:

a. the name and address of the person and/or entity from whom the piece was obtained or purchased;

b. the name and address of the manufacturer of the piece; and

c. if this Defendant manufactured the piece, when did manufacture first begin.

**ANSWER:** Style did not manufacture the piece. The piece has been manufactured for Style by three sources: Alan Gregerman Co., Providence, RI; Dannik, Inc., 15 Vallette Street, Cranston, RI; and Seigee Jewelry Corp., Seigee Bldg., 439-11, Shin WOl Dong, Yang Chun Gu, Seoul, Korea.

**INTERROGATORY NO. 6:** List the name and address of each customer, whether an individual or business entity, to whom you have sold the "Crystal Angel", which is the subject of the Plaintiff's Complaint and identify the particular items of jewelry sold to each customer (i.e., earrings, pin, pendant or some combination thereof).

**ANSWER:** Assuming that this Interrogatory addresses the jewelry piece sold by Style that is the accused piece in plaintiff's Complaint, Style has sold the piece as a pendant to Target Stores, Inc. Style has sold a similar piece as an earring and as a tac-pin to Seta Corporation of Boca Raton, Florida.

**INTERROGATORY NO. 7:** With regard to the "Crystal Angel" pin, please state:

a. whether you claim you have independently created or manufactured the piece. If so, please set forth all facts and detail concerning the design or creation.

b. the number of units of this item you have manufactured;

c. the date you first began manufacture of this item;

d. whether you are still manufacturing the item, and if not, the date

you ceased manufacturing the item;

e. the name and address of every person or entity to whom you sold this item of jewelry (or who placed an order for the item), the number of units you sold, or the number of units ordered from you and the price at which you sold each item (or the price at which it was ordered);

f. the name, home address, business address and job title of each person involved in the design of this item of jewelry;

g. the name, home address, business address and job title of each person involved in making any mold used to make this item of jewelry;

h. the sale price of this item of jewelry, without taking into consideration wrapping, shipping, carding or any packaging;

i. the profit you derived from the sale of this item, with an explanation of how you arrived at the profit figure;

j. the precise location (street address, city/town, state) of all inventory of this item;

k. whether, at any stage in the process of designing or manufacturing this item, you or anyone else copied any item of jewelry made or sold by Plaintiff, Mag Jewelry Co., Inc., and if so, give name, home address, business address and job title of each person involved in such copying;

l. the cost to this Defendant of manufacture of each "Crystal Angel"

pin;

m. the name, address and telephone of all suppliers (including the name of the individual with whom this Defendant dealt with) who provided component parts used by the Defendant in manufacturing the piece, including the identification of the specific components parts supplied and the cost to this Defendant of each such component part; and

n. the name, address and telephone of each person and/or entity who provided labor (including the identity of the representative of said company that the Defendant dealt with) with regard to the manufacture of component parts in the manufacture of the "Crystal Angel" pin, including but not limited to soldering, gluing, packaging, etc.

**ANSWER:** Style does not claim to have independently created a crystal angel pin. Style did not manufacture the piece, but purchased and resold a quantity of crystal angel pins to Seta Corp. at approximately $1.30 per piece. Invoices compiled by Style thus far total 23,760 pins shipped to Seta; Style has located additional invoices and is compiling them. The additional invoices show combined gross sales of $29,586.83 for additional pins *and* earring sets; the breakdown for this additional amount of sales (as between pins and earring sets) it is at this time not known, and Style will supplement this Answer in due course. Style did not design the piece, which was widely available on the market in the early 1990's and, upon information and belief, prior to that time. No molds were utilized by Style. The pin sold to Seta was manufactured and supplied by Alan

Gregerman Co., and later by Dannik, Inc. Style paid Gregerman $.78 per piece and Dannik $.72 per piece. Style is in the process of calculating the profit, if any, it derived from the sale of this piece after accounting for its hard costs and a percentage of overhead. Style has a few samples of this piece in inventory at this time at its Rhode Island place of business. Style did not copy any piece sold or created by Mag jewelry.

**<u>INTERROGATORY NO. 8:</u>** With regard to the "Crystal Angel" earrings, please state:

a. whether you claim you have independently created or manufactured the piece. If so, please set forth all facts and detail concerning the design or creation;

b. the number of units of this item you have manufactured;

c. the date you first began manufacture of this item;

d. whether you are still manufacturing the item, and if not, the date you ceased manufacturing the item;

e. the name and address of every person or entity to whom you sold this item of jewelry (or who placed an order for the item), the number of units you sold, or the number of units ordered from you and the price at which you sold each item (or the price at which it was ordered);

f. the name, home address, business address and job title of each person involved in the design of this item of jewelry;

g. the name, home address, business address and job title of each person involved in making any mold used to make this item of

jewelry;

h. the sale price of this item of jewelry, without taking into consideration wrapping, shipping, carding or any packaging;

i. the profit you derived from the sale of this item, with an explanation of how you arrived at the profit figure;

j. the precise location (street address, city/town, state) of all inventory of this item;

k. whether, at any stage in the process of designing or manufacturing this item, you or anyone else copies any item of jewelry made or sold by Plaintiff, Mag Jewelry Co., Inc., and if so, give name, home address, business address and job title of each person involved in such copying;

l. the cost to this Defendant of manufacture of each "Crystal Angel" earring;

m. the name, address and telephone of all suppliers (including the name of the individual with whom this Defendant dealt with) who provided component parts used by the Defendant in manufacturing the piece, including the identification of the specific components parts supplied and the cost to this Defendant of each such component part; and

n. the name, address and telephone of each person and/or entity who provided labor (including the identity of the representative of said company with whom the Defendant dealt with) with regard to the

manufacture of the "Crystal Angel" earrings, including but not limited to soldering, gluing, packaging, etc.

**ANSWER:** Style does not claim to have independently created crystal angel earrings. Style did not manufacture the piece, but purchased and resold a quantity of the earring to Seta Corp. at approximately $2.50 per pair. Invoices compiled by Style thus far total 11,349 earring pairs shipped to Seta; Style has located additional invoices and is compiling them. The additional invoices show combined gross sales of $29,586.83 for additional pins *and* earring sets; the breakdown for this additional amount of sales (as between pins and earring sets) it is at this time not known, and Style will supplement this Answer in due course. Style did not design the piece, which was widely available on the market in the early 1990's and, upon information and belief, prior to that time. No molds were utilized by Style. The earrings sold to Seta were manufactured and supplied by Alan Gregerman Co., and later by Dannik, Inc. Style paid Gregerman and Dannik $1.24 per pair. Style is in the process of calculating the profit, if any, it derived from the sale of this piece after accounting for its hard costs and a percentage of overhead. Style has a few samples of this piece in inventory at this time at its Rhode Island place of business. Style did not copy any piece sold or created by Mag jewelry.

**INTERROGATORY NO. 9:** With regard to the "Crystal Angel" necklace, please state:

a. whether you claim you have independently created or manufactured the piece. If so, please set forth all facts and detail concerning the design or creation;

b. the number of units of this item you have manufactured;

c. the date you first began manufacture of this item;

d. whether you are still manufacturing the item, and if not, the date you ceased manufacturing the item;

e. the name and address of every person or entity to whom you sold this item of jewelry (or who placed an order for the item), the number of units you sold, or the number of units ordered from you and the price at which you sold each item (or the price at which it was ordered);

f. the name, home address, business address and job title of each person involved in the design of this item of jewelry;

g. the name, home address, business address and job title of each person involved in making any mold used to make this item of jewelry;

h. the sale price of this item of jewelry, without taking into consideration wrapping, shipping, carding or packaging;

i. the profit you derived from the sale of this item, with an explanation of how you arrived at the profit figure;

j. the precise location (street address, city/town, state) of all inventory of this item;

k. whether, at any stage in the process of designing or manufacturing this item, you or anyone else copied any item of jewelry made or sold by Plaintiff, Mag Jewelry Co., Inc., and if so, give name, home address, business address and job title of each person

involved in such copying;

l. the cost to this Defendant of manufacture of each "Crystal Angel" necklace;

m. the name, address and telephone of all suppliers (including the name of the individual with whom this Defendant dealt with) who provided component parts used by the Defendant in manufacturing the piece, including the identification of the specific components parts supplied and the cost to this Defendant of each such component part; and

n. the name, address and telephone of each person and/or entity who provided labor (including the identity of the representative of said company with who the Defendant dealt with) with regard to the manufacture of component parts in the manufacture of the "Crystal Angel" piece, including but not limited to soldering, gluing, packaging, etc.

**ANSWER:** Style does not claim to have independently created a crystal angel necklace. Style did not manufacture the piece, but purchased and resold approximately 170,430 pieces. Style did not design the piece, which was widely available on the market in the early 1990's and, upon information and belief, prior to that time. No molds were utilized by Style. Style adapted a piece purchased from Alan Gregerman Co. by removing the post from the earring configuration and adding a bale to attach it to a necklace chain. Style sold the necklace to Target Stores, Inc. Style's records indicate it shipped 173,430 pieces to Target Stores, Inc. at $1.50 per piece, to which a ten-percent

(10%) discount applied, leaving an actual sales price of $1.35 per piece. The sale price included wrapping and carding. The necklace sold to Target was manufactured and supplied by Seigee Jewelry Corp., from which Style purchased the piece at $.47 per piece. Additional hard costs to Style included shipping at $.09 per piece, carding at $.03 per piece, freight of $.12 per piece, and duty of $.05 per piece. Style is in the process of calculating the profit, if any, it derived from the sale of this piece after accounting for its hard costs and a percentage of overhead. Style has a few samples of this piece in inventory at this time at its Rhode Island place of business. Style did not copy any piece sold or created by Mag jewelry.

**INTERROGATORY NO. 10:** Provide the name, address and telephone number of the individual responsible for shipping the subject "Crystal Angel" jewelry piece to this Defendant's respective customers.

**ANSWER:** Style shipped the pieces to its customers itself, utilizing various employees assigned and supervised by Mr. Mollica.

**INTERROGATORY NO. 11:** Has this Defendant or any of its managing officers or directors made a claim of copyright infringement, whether orally or in writing, against any person or entity? If so, please describe the nature of the claim, identify the person or entity against whom the claim was made, and describe the resolution or current status of the claim.

**ANSWER:** Style objects to this interrogatory because it is overly broad and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving the objection and subject to it, Style has not made any claim of copyright infringement concerning crystal angel jewelry.

**INTERROGATORY NO. 12:** Has any person or entity ever made a claim of copyright infringement, whether orally or in writing against this Defendant, or any of its managing officers or directors? If so, please state the nature of the claim, identify the person or entity who made it or is making the claim, and describe the resolution or current status of the claim.

**ANSWER:** Style objects to this interrogatory because it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving the objection and subject to it, Style answers that it has not been the subject of a claim of copyright infringement.

**INTERROGATORY NO. 13:** Has this Defendant ever applied for a copyright registration? If so, identify the application by stating the name or names in which the application was filed; the filing date; the nature of the work that was the subject of the application; and, if a registration certificate issued, the date of issuance, the registration number and the name and address of each person who has possession, custody or control of the registration certificate.

**ANSWER:** Style objects to this interrogatory because it is overly broad and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving the objection and subject to it, Style has not applied for copyright registration.

**INTERROGATORY NO. 14:** With regard to any person you expect to call as expert in this matter, please state:

a. the expert's name, address and specialty;

b. the expert's educational background and details as to his qualifications;

c. the subject matter about which the expert is expected to testify;

d. the substance of the facts and opinions to which the expert is expected to testify; and

e. a summary of the grounds for each such opinion.

**ANSWER:** Style has not yet made a determination as to a testifying expert and reserves the right to supplement this Answer in a timely manner prior to trial.

**INTERROGATORY NO. 15:** Please set forth a breakdown of the cost, per piece, to this Defendant for the "Crystal Angel" pin, including, but not limited to the cost for the component parts (i.e. stones, jump ring, etc.), the cost for platting or soldering or the cost for casting, and if casted, the cost for the gluing of the stones into the piece.

**ANSWER:** Please see Answer to Interrogatory No. 7.

**INTERROGATORY NO. 16:** Please set forth a breakdown of the cost, per piece, to this Defendant for the "Crystal Angel" earrings, including, but not limited to the cost for the component parts (i.e. stones, jump ring, etc.), the cost for platting or soldering or the cost for casting, and if casted, the cost for the gluing of stones into the piece.

**ANSWER:** Please see Answer to Interrogatory No. 8.

**INTERROGATORY NO. 17:** Please set forth a breakdown of the cost, per piece to this Defendant for the "Crystal Angel" necklace, including but not limited to the cost for the component parts (i.e. stones, jump ring, etc.), the cost for platting or soldering or the cost for casting, and if casted, the cost for the gluing of stones into the piece.

**ANSWER:** Please see Answer to Interrogatory No. 9.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and accurate based on my own personal knowledge or from knowledge or information derived in my official capacity as President of Style Accessories, Inc. or that, where stated, I believe such to be true.

12/29/04
Date:

Chad R. Mollica

Dated: December 30, 2004

STYLE ACCESSORIES, INC.

By Their Attorneys,

Thomas R. Noel (#4239)
NOEL & GYORGY LLP
50 South Main Street
Providence, RI 02903
401.272.7400 Telephone
401.621.5688 Facsimile

**CERTIFICATION**

I, the undersigned, do hereby certify that on the 30 of December, 2004, I served a true copy of defendant Style Inc.'s Answers to Plaintiff's Interrogatories to the following counsel of record by First Class Mail: Thomas A. Tarro III, Esq., The Summit East, Suite 330, Centerville Road, Warwick, RI 02886 and Craig M. Scott, Esq., Duffy Sweeney & Scott, Ltd., One Turks Head Place, Suite 1200, Providence, RI 02903.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

MAG JEWELRY CO., INC.

Plaintiff

VS. C.A. NO.: 04-174T

CHEROKEE, INC., ROBERT MARGOLIS AND TARGET CORPORATION d/b/a TARGET STORES and STYLE ACCESSORIES, INC.

Defendants

**AFFIDAVIT**

I, Donald Donnelly, under oath, do hereby state as follows:

1. I am a sales representative for Mag Jewelry Co., Inc. and have been since 1989. I submit this affidavit in support of the Plaintiff's Objection which has been filed to the Defendant, Style Accessories, Inc.'s Motion for Summary Judgment.

2. I have been involved in the jewelry industry for over forty (40) years, in various capacities including import/export, jewelry manufacturer, and sale representative to numerous manufacturers of crystal stone jewelry and other jewelry manufacturers at a variety of jewelry shows, nationally and internationally.

3. I had attended approximately 100 jewelry shows throughout the country during the period of time from 1958 to March, 1992.

5. In my capacity as sales representative for Mag Jewelry Co., Inc., I witnessed the creation and design of the subject "Crystal Angel" jewelry piece by Daniel Magnanimi during the months of January and/or February and prior to March 5, 1992.

6. On March 5, 1992, I first displayed the "Crystal Angel" jewelry piece as part of the Mag line at the United Jewelry Show at the Biltmore Hotel in Providence, Rhode Island and the "Crystal Angel" jewelry piece has remained in my product line since that time.

7. Mag continually displayed the "Crystal Angel" jewelry piece at the Jewelry Manufacturer's Associates headquarters at the Biltmore Hotel in Providence, Rhode Island from March, 1992 to 1999. Subsequently, the piece was continually shown at Mag's showroom at Davol Square in Providence, Rhode Island from 1999 to 2000. The "Crystal Angel" jewelry piece was shown at the jewelry show at the Crowne Plaza Hotel in Warwick, Rhode Island in September, 2002. Also, the piece was always on display at Mag's showroom at its headquarters at 838 Dyer Avenue in Cranston, Rhode Island, as well as at the various jewelry shows, I attend, nationally as a sale representative for Mag Jewelry up to the present time.

8. According to my records, I first took sample orders for the "Crystal Angel" from a company called Merlite, on September 12, 1994. The item number for the piece was 948 and/or AB948.

9. In my capacity as sales representative for Mag Jewelry, I have conducted business with representatives from Catalogue Ventures as early as July, 1990. Moreover, I have personal knowledge that Robert Piro of Catalogue Ventures was present at Mag's showroom at the United Jewelry Show at the Biltmore Hotel in Providence, Rhode Island during the show in March, 1992, at which time the "Crystal Angel" jewelry piece was being displayed.

Further Affiant sayeth not.

Donald Donnelly

STATE OF RHODE ISLAND
COUNTY OF KENT

In Warwick in said County on the 8th day of September ,2005, before me personally appeared Donald Donnelly, each and all to me known, and known by me to be the party executing the foregoing instrument and he acknowledged said instrument, by him executed to be his free act and deed.

Notary Public
My Commission Expires: 11/04/05

buy boxed or unboxed.
Q. Does this production book sheet, Exhibit 10, cover all three formats?
A. I couldn't say, I don't think it does. No, a neck is $36 and I would say a pin was $27.
Q. That doesn't cover earrings then?
A. No.
Q. Earrings are constructed with different components, aren't they?
A. There are two different ways to do it on an item like this. We sold it two different ways. We sold it with a post, a hypoallergenic post, soldered to the back instead of a tack, a post. And the other way would be from the halo, a fishhook. It is called a fishhook. It's an ear wire. So this one was only a tack pin and the neck.
Q. Were those earrings produced in 1992?
A. I don't think so. Samples were made but this item never really sold initially.
MR. NOEL: Why don't we take just a two-minute break, five minutes, whatever you want.
MR. TARRO: That's fine.
(A short recess was taken.)
MR. NOEL: Back on the record.



Q. BY MR. NOEL: Let's talk about trade shows for a second. Is it part of your duty at Mag to attend trade shows?
A. Yes.
Q. Was it in the first three years of your association with Mag?
A. Yes.
Q. Can you tell me the first trade show you attended with Mag or for Mag?
A. United Jewelry Show.
Q. And is that held in Providence?
A. This one was, yes, the Biltmore Hotel.
Q. The first one that you ever attended on behalf of Mag?
A. Yes.
Q. Who runs the United Jewelry Show?
A. It's defunct.
Q. Who was it?
A. The Fashion Jewelry Sales Association from New York and the Fashion Jewelry Association of Rhode Island, two different things formed the United Jewelry Show.
Q. Are they now MJSA?
A. No. MJSA is another organization more with silversmiths rather than fashion or costume.



Q. Is there still a United Jewelry Show?
A. It's defunct.
Q. The show itself isn't called that? There's no show called that?
A. It went broke or whatever.
Q. When was that first show you attended?
A. With the Mag line?
Q. Yes.
A. I want to say 1989.
Q. And then did you attend -- just you personally -- one show a year or several a year?
A. We did three. At that time we were doing three or four shows a year.
Q. When you say we, you mean you and somebody else from Mag?
A. The association. The association held two shows in Rhode Island and two shows in New York.
Q. And I'm trying to get an idea of how many or which shows you attended in the early years that you were with Mag.
A. That I exhibited in?
Q. Yes.
A. Those four shows.
Q. Each year?
A. Yes.



Q. Okay. And you went to all the shows basically through the years?
A. Yes.
Q. Did you at some point have the Mag crystal angel at a show?
A. Yes.
Q. When was the first time?
A. It would have been in the show held in what we would call the fall Christmas show of '92, which would have been in -- those shows bounce back and forth -- in February or March, probably March, at that time.
Q. And how do you remember that the Mag crystal angel was displayed at that show?
A. I know it was made and put into the line. When Danny was working on those pieces he was working on, he would get involved with design or creating new stuff three to four weeks prior to the beginning of a show and whatever he put together is what we would go into the show with.
Q. Do you remember the date of the creation that you were referring to or testifying to?
A. No.
Q. But you're sure it was the fall Christmas show of '92 that it was first displayed at?

Page 54

A. Yes. Which takes place -- that show takes place in the spring.
Q. Was it called the United Jewelry Show at that time?
A. Yes.
Q. That's one of the United Jewelry Shows?
A. Yes.
Q. Where was that held?
A. Biltmore Hotel.
Q. Here in Providence?
A. We were in the Biltmore. There were people also in the Holiday Inn and the Regency, maybe the Cranston Hilton and the Marriott. This was formerly the fashion jewelry capital of the world.
Q. Did Mag keep a record of attendees at its booth or in its rooms at the shows?
A. A list is published for exhibitors' use only of people that register at those shows, that's given to us usually within a month or two after the show. It's a confidential record that we're not supposed to, you know.
Q. But did Mag keep a list of people that actually walked into its booth or showroom?
A. No, you can't keep an actual record.
Q. Why not?

Page 55

A. You only have a record of those that actually make a purchase. You don't ask someone to register when they walk into your room, you pray someone walks into your room.
Q. So Mag has never asked people to register coming into their showroom?
A. No.
MR. NOEL: Just so she has an easier time, I'm going to try and you, please, try also. Wait till I finish my question before you start your answer so that she doesn't have us both talking at once; okay?
THE WITNESS: Okay.
Q. Who did you attend -- who else attended that show aside from you? Let me rephrase that, who else from Mag Jewelry attended that show other than you?
A. Well, I know Danny comes by the show, not in a sales capacity but more in a social capacity usually. He let me handle the sales end of it. It would be mainly myself, I'm the one that worked the room. Those days we didn't really need any assistance from anyone else.
Q. In 1992, did Mag have its own room at the Biltmore?

Page 56

A. Yes.
Q. Was that just a regular hotel room that's in the hotel?
A. In '92 we might have had our own permanent showroom in the hotel. Three floors of the hotel were turned into permanent showrooms. The third, fourth and fifth floors were permanent showrooms, they were condo'd. I don't remember exactly what the year was.
Q. Well, if it wasn't in that state then, what would it have been?
A. It was a suite, we would take a suite in a hotel room and set it up with all of our -- with our new line and whatever was hopefully good still selling from the previous show.
Q. You actually take orders at those shows?
A. Yes.
Q. Hopefully.
A. Yes, Lord willing.
Q. How many items did you have at that 1992 United Jewelry Show?
A. Hundreds.
Q. A couple hundred?
A. Oh, easy.
Q. 700?

Page 57

A. It could have been.
Q. Not more than 1,000?
A. I don't think so.
Q. And these hundreds of items, are they all Mag Jewelry created items?
A. Yes.
Q. And it's your testimony that at that particular show this crystal angel was on display; is that right?
A. Yes.
Q. Do you have any photographs from that show?
A. No.
Q. Are there any records of purchase of the crystal angel from that show?
A. No.
Q. Do you still have records of purchase of other items from that particular show?
A. No.
Q. Those were not maintained?
A. I don't know, that's -- I didn't maintain them. I don't have any records that old.
Q. Does Mag Jewelry?
A. I don't know.
Q. Was it common practice to photograph the room or the booth?

**Purchase Order** **No.** 0819

*Mag Jewelry & Reena International*
838 Dyer Avenue
Cranston, R.I. 02920

Tel.: (401) 942-1840
Fax: (401) 946-6850
Showroom: 440-442 JSA (401) 454-7969

Show ☑
Other ☐

9/12/94

Sold To: Merlite

Tel.:

Fax:

TERMS: NET 30 DAYS

| ITEM NO. | PRICE | SAMPLES | STOCK | G | S | DESCRIPTION |
|---|---|---|---|---|---|---|
| AB801 | | | | | | GUARDIAN LOCKET |
| FF790 | | | | | | FLOATING HEART |
| FF789 | | | | | | " " |
| AB297 | | | | | | |
| AB679 | | | | | | |
| AB781 | | | | | | |
| AB695 | | | | | | |
| PJ418/2T | | | | | | CRUCIFIX |
| PJ417/2T | | | | | | |
| HT66 ANT PH | | | | | | ANT. |
| TP156 E | | | | | | CROSS ENG |
| 830 NC | | | | | | |
| 136 LC | | | | | | |
| PJ402 | | | | | | |
| J61 | | | | | | ENGRAVED |
| FW484CRYS | | | | | | |
| PJ406 CRYST | | | | | | |
| T43CRYS | | | | | | |
| D368/D | | | | | | |
| T91D/CRY | | | | | | |
| HT167 ANT | | | | | | |
| FW329 | | | | | | |
| TM120C | | | | | | |
| 498 | | | | | | |
| LB11 | | | | | | |
| PJ341 | | | | | | |
| MP56 | | | | | | |
| 684C/3 | | | | | | |
| 2025 | | | | | | |

Comments:

**Purchase Order** No. 0820

*Mag Jewelry & Reena International*
838 Dyer Avenue
Cranston, R.I. 02920

Tel.: (401) 942-1840
Fax: (401) 946-6850
Showroom: 440-442 JSA (401) 454-7969

Show ☑ 9/12/94
Other ☐

FOR "EARS"

Sold To: Merlite

Tel.:

Fax:

TERMS: NET 30 DAYS

| ITEM NO. | PRICE | SAMPLES | STOCK | G | S | DESCRIPTION |
|---|---|---|---|---|---|---|
| 8700PE | | | | | | P1109/2 Rush |
| 8699 PE | | | | | | |
| 8705PE | | | | | | AB 739/ |
| 8709 PE | | | | | | |
| 8713PE | | | | | | PE 3000/1 CAMEO |
| 8693 PE | | | | | | PE 1194/1 " |
| 9182PE | | | | | | PE1194/4 " |
| 9185CE | | | | | | PE1068/3 |
| 9184PE | | | | | | PE1068/2 |
| 8690PE | | | | | | |
| 8688 PE | | | | | | |
| 8684 PE | | | | | | |
| 8681 PE | | | | | | |
| 8639PE | | | | | | |
| 8636PE | | | | | | |
| 8635PE | | | | | | |
| 8634 PE | | | | | | |
| 8674 | | | | | | |
| 8673 | | | | | | |
| PE 1071/3 | | | | | | |
| PE 1114/3 | | | | | | |
| PE 1069/3 | | | | | | |
| PE 3752 | | | | | | |
| PE1069/1 | | | | | | |
| PE1071/1 | | | | | | |
| PE 1069/2 | | | | | | |
| P 1105/3 | | | | | | |
| P 1105/1 | | | | | | |
| P1106/1 | | | | | | |

Rush must have Immed

Comments:

**Purchase Order** No. 0821

Mag Jewelry & Reena International
838 Dyer Avenue
Cranston, R.I. 02920

Tel.: (401) 942-1840
Fax: (401) 946-6850
Showroom: 440-442 JSA (401) 454-7969

Show ☑
Other ☐

9/12/94

Sold To: Merlite

Tel.:

Fax:

TERMS: NET 30 DAYS

| ITEM NO. | PRICE | SAMPLES | STOCK | G | S | DESCRIPTION |
|---|---|---|---|---|---|---|
| 529C | | | | | | FW118 |
| 661C | | | | | | FW110 |
| FD142C/cryst | | | | | | FW109 |
| NR 47C | | | | | | CH105 |
| 958 CRYS | | | | | | CH 124 |
| HF142 POL. | | | | | | CH 115 |
| HT4 ENG | | | | | | AG 73 |
| MP-232 | | | | | | CH 123 |
| FW409 | | | | | | CH 81 PRL |
| FW438 | | | | | | CH 175 PRL |
| FF787 | | | | | | |
| HS44 | | | | | | CERAMIC FLOWERS |
| 947C | | | | | | |
| 948 | | | | | | |
| T70 | | | | | | |
| T71 | | | | | | |
| LB-3 | | | | | | |
| FW377 | | | | | | |
| FF763 | | | | | | |
| FF766 | | | | | | |
| MP53E | | | | | | |
| MP57E | | | | | | |
| 608 PH | | | | | | |
| FW9 | | | | | | |
| FW13 | | | | | | |
| FF787 | | | | | | |
| | | | | | | "I LOVE YOU" HEART. |
| | | | | | | |

Comments: ANY - RELIGIOUS GIMMICK
NEW. MUSTARD SEED items etc

Page 54

need to mark it, interrogatory answers, that I'll represent that you signed back in 1997 in the Eden, E-D-E-N Jewelry case. I'm looking at answer number 5.
MR. NOEL: I just want to show him answer number 5.
MR. TARRO: Yes, that's fine. You're going to mark this?
MR. NOEL: I don't know if I have to, I guess I better, I'll do it as 35.
MR. TARRO: That's fine.
(MAG'S EXHIBIT 35 MARKED FOR ID)
Q. Mr. Magnanimi, feel free to look through this. I'm showing you the last page, is that your signature?
A. Yes.
Q. These purport to be interrogatory answers that you and your attorney filed --
A. That's correct.
Q. -- in the Eden case. You're free to look at whatever you want, but I'm asking you to look at the answer to number 5, there's a list of what appears to be shows there, can you look that over for a second?
A. Okay (witness complied).

Page 55

Q. As far as you know, sitting here today, is that still an accurate answer, that those were the shows that Mag Jewelry attended during that time period, and that that's the whole list of shows?
A. It looks to be correct.
Q. So, is it your testimony that you took the Crystal Angel in some form to each and every one of these shows listed here during the time period --
A. Oh, yes, yes.
Q. From Mr. Donnelly's deposition testimony, I'll ask you the same thing, but he indicated to us that the first sale that was made occurred in September of 1994, at least the first time that samples were shipped out, would that be in conjunction with the Biltmore show?
A. Yes.
Q. Did the Crystal Angel sell, did Mag Jewelry sell any Crystal Angel pieces during this entire period, before the September of '94 show?
A. No.
Q. So, it's your testimony that, though you took the angel to each of these shows, and had it on display for whoever came into the booth, nobody purchased it, correct?
A. Correct.

Page 56

Q. Do you have records from any of these shows listed here as to the products that you actually had with you there?
A. No.
Q. Do you have records from any of these listed shows of the people who came through your booths?
A. No.
Q. You just didn't do that?
A. Still don't, not many people come through anymore, anyway.
MR. TARRO: Just answer the question.
THE WITNESS: Okay.
MR. NOEL: Why don't we take a break for a second.
(LUNCH BREAK, 1:17 PM - 2:29 PM)
(MAG'S EXHIBITS 36 AND 37 MARKED FOR ID DURING LUNCH BREAK)
Q. Mr. Magnanimi, where are the angel pieces manufactured?
MR. TARRO: Objection as far as a time frame, when?
Q. Where are they today?
A. Rhode Island.
Q. At your offices, at your plant?
A. Well, we get stones in, and we give them to

Page 57

subcontractors to be soldered, and send them out to be plated.
Q. Were these ever made overseas?
A. No.
Q. Never made in Asia?
A. No.
Q. Let me show you what's been marked as Exhibit 36, take a look at that and tell me if you can identify it.
A. It's a sample order from Merlite.
Q. I have three pages here?
A. Yes.
Q. Is that part of the same order?
A. Yes.
Q. Was this at that '94 jewelry show?
A. Yes, 9/12/94.
Q. It says show on it, right, show is checked off?
A. Yes.
Q. Is that Don Donnelly's handwriting?
A. Yes.
Q. Is any of this yours?
A. No.
Q. Were you at that show?
A. I don't remember.
Q. Does this show sales, or does this show an order

for the Crystal Angel?
A. It shows a request for a sample.
Q. Can you show me where it shows that?
THE WITNESS: What was the FW number?
MR. TARRO: You're looking at, this is 9 --
THE WITNESS: 4.
MR. TARRO: 4.
Q. Well, the FW number is in the logbook, right?
MR. TARRO: It was FW655 and AB948. Do you see the 948?
THE WITNESS: No, I don't.
MR. TARRO: Do you need your glasses?
THE WITNESS: You see --
MR. TARRO: Do you mind if I -- it's up to you.
MR. NOEL: It says FW948 somewhere?
MR. TARRO: No, it doesn't.
THE WITNESS: It says 948.
Q. If you want to point out where it says 948, I can ask about it. (Witness Indicating) You're pointing to the third page of the document, I think these were made from the exhibits that Mr. Tarro had today, I'm not sure, the prefixes came off, but we'll look at that after.



A. Okay.
Q. It says 948 here?
A. Yes.
Q. And what else did you say shows the angel?
A. It should say AB948.
Q. Are any of these other entries showing the angel?
A. No.
Q. After 948, there's nothing written across this line, do you agree?
A. I agree.
Q. What does this tell you?
A. That she wanted a sample, she wanted a piece.
Q. Under description, what are these descriptions?
A. These are just, he didn't want to do another sheet, so he added these numbers of the sheet.
Q. This is a continuation of what the left hand column lists?
A. Yes.
Q. Is this the regular purchase order form that you maintained at the time at Mag?
A. Yes.
Q. Now, how do you know that they're looking for samples of these?
A. Because they come in and they, normally, it's two or three girls, they lift the pieces out of



the vacuum forms that they want, and you write fast, and you send them samples. They never order at the show.
Q. Customers, generally, you mean?
A. No, it's a catalog customer.
Q. You mean Merlite, in particular?
A. Yes.
Q. And have the numbers 948 ever been assigned to another piece at Mag, aside from the letters that may or may not be before it?
A. No.
Q. 948 has never been used before?
A. I don't believe so. Well, I shouldn't say that, 948 could be. No, I don't believe we ever went past 5 or 600. Over here, FW went to 700 -- I don't believe so.
Q. You don't believe what?
A. I don't believe we went up to 900 in anything else.
Q. Well, I see FF787, 608PA, or PH, right?
MR. TARRO: Can I just --
(OFF THE RECORD)
Q. So, when Mr. Donnelly took this order for samples, what did Mr. Donnelly do next?
A. He hands this order into the office, and we



have a girl pull one of each, or make one of each, and ship the samples to Merlite.
Q. Do you remember if you had to pull or make 948?
A. We didn't keep inventory on anything back then, so --
Q. Would you have sent just one piece?
A. Yes.
Q. This doesn't, does this say whether -- strike that. Did 948 correspondence to either the pin or the earring or the necklace?
A. 948 was the pin.
Q. Had Merlite been a customer before this point?
A. Yes.
Q. Is it still?
A. Yes.
Q. Is it still called Merlite?
A. Yes.
Q. Where are they located?
A. New York.
Q. Do you know the address?
A. I don't know it here, but -- I don't know it now.
Q. But, they're known under the name of Merlite?
A. Yes, I believe they still buy the same angel, too.

Page 58

A. No.
Q. How was it displayed at that show?
A. In a jewelry tray which had a vacuum form in it. The vacuum form has like -- depending upon what size -- six to twelve cavities and there's a gray velour insert that's in there and the jewelry would be shown on the velour insert.
Q. Can you tell me if there were other pieces made from crystal stones specifically at that show?
A. Yeah, we discussed that earlier.
Q. I'm asking about this show specifically. Was there a line of crystal jewelry?
A. Well, I wouldn't call it a line of crystal jewelry but I told you, he made crosses. He had like a, you know, a dove or other things made out of crystal stones in addition to the angel.
Q. Were those all grouped together in one area as, you know, these are crystal items here?
A. No, they would be shown like just in the inspirational division or the religious part of Mag Jewelry.
Q. Were there sales made of those other crystal items at that show?
A. I don't recall.
Q. It's possible that none of the crystal items sold

Page 59

at that show?
A. Yes, it is very possible.
Q. Didn't you say that those other crystal items, that crosses and doves had been in the line for some time?
A. No, I said he was working on stuff like that and creating them there at that time. I believe that's what I said.
Q. Is it your testimony then that Mag had not prior to that show sold any pieces comprised of just crystal stones?
A. No.
Q. Do you know?
A. No, I said, no, they've sold crosses, birthstone crosses before that, they sold them before I was there. They sold, I told you, they had a little cast crystal angel with a crystal stone in it as a birthstone. They sold that before I was there.
Q. Were those sold at that jewelry show?
A. Yes.
Q. Was the crystal angel included in the line for all the next several jewelry shows?
A. Yes, it would be brought in. If it wasn't a permanent -- once we had the permanent showroom,

Page 60

stuff was just left in the room, we didn't have to take stuff in a row. We just would bring in new stuff, really, and those were in trays so they took very little space, they didn't take displays at that time.
Q. But the crystal angel was present if it was a permanent showroom from that point on; correct?
A. Yes.
Q. Along with the crystal crosses and the crystal doves and other things?
A. Things that had crystal in them. The things that sold the most at that time were crosses, cross necks with just one stone or that cast angel with the one stone.
Q. Do you recall the first time that you sold one of the crystal angel pieces?
A. The first time anyone requested a sample of it that I kept a record of was 1994.
Q. How is it that you remember that?
A. Because I've gone over this over the past ten years or whatever it is on numerous occasions.
Q. For purposes of other litigations?
A. Exactly.
Q. You said the first time someone requested a sample it was '94?

Page 61

A. Yes.
Q. Did Mag actually sell pieces in 1994?
A. The catalog company requested the sample. Normally they were not or would not be invoiced or I would ask that the sample be given free of charge. Whether or not that sample was ever invoiced or it was invoiced at no charge, so that a record would have been kept, I don't know, but I know that it happened.
Q. What was that catalog company?
A. At that time the catalog company was called Merlite.
Q. (M-e-r-l-i-t-e)?
A. Correct.
Q. What catalog did they produce at that time?
A. They had -- the catalog was called Merlite, at least the one that we sold to them. They were in New York City at that time.
Q. Do you know who that catalog was distributed to wholesale/retail?
A. Consumers.
Q. So, was that the first time somebody -- was it Merlite who first requested the crystal angel?
A. That's the first one that requested a sample of it from me, yes.

A. Yes.
Q. Can you tell me what these pages tell us about the crystal angel?
MR. TARRO: Objection.
Q. Those sales that were made?
A. Well, Marclar samples, six dozen in birthstones.
Q. Where are you pointing to?
A. Marclar AB948/W5. W5 is that card, that's the guardian angel card. Line one, two, three, four, five, sixth line down.
Q. I see that.
A. Jewels & Such, AB948/W5, fifth line down.
Q. That's the crystal angel?
A. Yes. And 1889 (sic) Klassen's order, looks like the round whole punched out AB but it says 948/W5.
Q. Yes.
A. Six dozen.
Q. And then on the first page?
A. Second written line, four dozen to SWJ Southwest for a dozen.
Q. Now AB948 is different than the production book number we had seen on your earlier document?
A. Yeah.



Q. Can you tell me why that is?
A. The item was changed over from being an expensive item as a boxed item and a necklace and it was changed to just a carded item and the cost would have been brought up more to date and refigured it and decided to sell it for less money.
Q. So it was a different item number assigned at some point?
A. Yes.
Q. Aside from the packaging and the display, had anything changed on the angel piece itself?
A. The construction?
Q. Yes.
A. No.
Q. Are these customers still in existence?
A. I can say that four out of five are. Marclar is in Panama. I haven't seen them in several years. Jewels & Such is in North Carolina but she does strictly wedding stuff now and she doesn't come to Rhode Island much anymore. Klassen Jewelers is still very, very active and a very sound customer out of Canada. And SWJ Southwest is still in business. We don't see them all that much but I do see them on occasion when I do a



show in Las Vegas. They don't come to Rhode Island much anymore.
Q. Are they still in Houston?
A. As far as I know they are, yeah.
Q. Where in Canada is Klassen? Do you know the city or province?
A. I would have been able to tell you if you didn't ask me but I do see them at least three or four times a year. We do Vegas twice a year, I see them. They love to come down from Vegas.
Q. And where is Jewels & Such?
A. Jewels and Such is in North Carolina. Her name is Jet Taylor. The girl that owns Klassen Jewelers -- her father owns it, Bob Klassen but she runs it. Her name is Barbara Klassen and she's got her daughter and her niece in there.
Q. What town is Jewels & Such in?
A. North Carolina and it's where the racetrack is.
MR. SCOTT: Is it Salem?
A. Charlotte, North Carolina. She's in the Convention Center there. She has a showroom strictly for religious -- excuse me, strictly for wedding goods.
Q. Thank you.



A. And Marclar is in Panama.
Q. I think you described these as sample orders?
A. Exactly.
Q. Did these customers pay for these samples?
A. Yes.
Q. Is that reflected on these documents that they paid for them and how much?
A. This won't say that they paid for them, only a check, a cancelled check, would show that.
Q. Well, this is --
A. They were invoiced for them, presumably invoiced.
Q. Right, because these are purchase orders; right?
A. Exactly.
Q. Then what happens when you take a purchase order, what did you do with purchase orders at that time?
A. Okay. I did the same thing as I said previously. I give the pink copy to the customer. I kept the yellow copy and I turned the white copy into the office and they would enter it into a computer system, generate work tickets, produce the merchandise, have a packing slip and create an invoice when the merchandise was shipped.
Q. So these are not invoices?
A. No.

A: Yes; Lewis & Roberts ceased mailing in 1995.

Q: Now, from the time you first formed this company — let me strike that. Were you involved in forming the company itself?

A: Yes.

Q: Were you an owner of the company?

Page 45

A: Yes.

Q: You have been an owner since 1988 until the present time?

A: Until November of 1996.

Q: With respect to your involvement with the company, did you have occasion yourself to attend the United Jewelry Show in Providence, Rhode Island?

Yes.

: Did you attend the United Jewelry Snow in the city of Providence, Rhode Island, from 1988 up to the present time?

A: Not every time, but, yes, I have attended from — during that period of time, yes.

Q: During those occasions when you attended the United Jewelry Show in Providence, Rhode Island, did you have occasion to go to the Mag Jewelry Company showroom?

A: Yes.

Q: In addition to yourself, were there other representatives of Catalog Ventures, Inc., that would attend the United Jewelry Show in Providence, F 'e Island?

: Yes.

Page 46

Q: Going back to 1988, would you be able to tell me the names of the individuals who represented Catalog Ventures, Inc., who attended the United Jewelry Show?

A: In — I'm trying to think here. Going back — well, in addition to myself in the first couple of years, say, in 1988 through 1990, Jonathan Fleischmann, who was another owner, would also attend. We had a buyer named Paul Bernier; in the next period we had another buyer named Paul Bernier. And probably then — I'm trying to think who — the next period, so that would be from '92 on, we had an additional buyer, Diane Cormier. And probably from '94 on, another buyer named Dawn Beausoleil. All of them might have attended.

Q: Would you know how to spell Mr. Beausoleil's name?

A: It's Dawn, D-a-w-n, Beausoleil B-e-a-u-s-o-l-e-i-l.

Q: Are all of these individuals still employed by the company?

A: Only Ms. Beausoleil, whose name is now McMann.

Q: And you indicated that Catalog Ventures,

Page 47

Inc., acquired product from Mag Jewelry, Inc.?

A: Yes.

Q: Would that have been all the way back to 1988?

A: It's possible.

Q: And with respect to the types of products acquired from Mag Jewelry Company, Inc., what do they consist of?

A: Jewelry.

Q: Any particular type of jewelry?

A: It would most likely have been any animal theme jewelry that I can recall, because primarily we were shopping for Nature's Jewelry since it was significantly larger than Lewis & Roberts and begun earlier and it's more difficult to find; so anything with a nature theme; so animals or flowers or plant depictions or things like that would be what we were seeking the most of.

Q: Would Catalog Ventures, Inc., acquire any angels, angel jewelry, from Mag Jewelry, Inc.?

A: Not likely. It is possible, but that, as I recall, the lines Lewis & Roberts was usually searching for were products of crystal, you know, products that would have crystal or along those

Page 48

lines. And it's sort of theme was the look of real; we were looking for items that really had a higher end look, the look of real gold.

It is more likely if we sampled something it would have been — it's possible, but it would more likely have been something that had a more substantial look to it. I don't recall having seen specific pieces of Mag that really looked like solid gold. Generally speaking, we obtained those samples from a number of other manufacturers. That type of jewelry is fairly widespread throughout Providence.

Q: With respect to the Lewis & Roberts catalog, its emphasis, you said, was on a higher-end of jewelry?

A: Lewis & Roberts is a higher-end of costume jewelry.

Q: You mentioned crystal. Is that one of the emphases of that particular line?

A: It was not an emphasis, but crystal was generally something that was not in Nature's Jewelry.

Q: And with respect to your involvement with Mag Jewelry, Inc., did you have occasion yourself

Page 49

to visit the showroom in Providence, Rhode Island?

A: Yes.

Q: Did you deal with Mr. Magnanimi himself?

A: Yes.

Q: Did you deal with Don Donnelly, who is seated here with me?

A: Oh, yes. I'm sorry.

MR. JEST: Why don't we identify —

A: I'm sorry. I guess Don is who I generally dealt with, but I believe I dealt — if I recall — I don't know.

THE WITNESS: Was he never in the showroom?

A: I'm sorry. I guess I'm confused, you know.

MR. JEST: Let's — Mr. Donnelly, well, Don Donnelly from Mag Jewelry has been in attendance at the deposition. I was going to point out to the witness, there can't be an interchange between you, sir, as the witness and somebody who is not participating in the deposition. That's all I'm trying to make clear. Thanks.

Q: (by Mr. Tarro) Okay. You have a recollection of dealing with Don Donnelly, who is

Page 50

seated here at the deposition?

A: Yes.

Q: You also have a recollection of dealing with Daniel Magnanimi, who is the owner of Mag Jewelry, Inc.?

A: I thought I had. I may have not recalled that right. It has been some time since I was at their showroom.

Q: When was the last time that you were at the showroom?

A: My guess would be five years ago.

Q: And with respect to the last time you were in the showroom, do you know if you purchased any samples at that particular time on behalf of your company?

A: I don't recall.

Q: During the period of time that you had a business relationship with Mag Jewelry, Inc., have you acquired samples from that company through the mail?

A: Yes.

Q: And with respect to the business

Depo. J. Bordieri in Mag Jewelry v. Cartoculs C.A. No. 97-0053ML


owner of that company, what were your duties and responsibilities?

A. Well, making designs and selling.

Q. And what type of a jewelry manufacturer was Empire Jewelry Company?

A. Rhinestone.

Q. Now, with regard to the notice of deposition, I've attached the photograph of the Crystal Angel, which is the subject matter of this litigation.

A. Yeah.

Q. I also have a sample of the Crystal Angel which I'm going to asked to be marked as Exhibit No. 2.

^ (Exhibit 2 was so marked)

Q. (By Mr. Tarro) I'll ask you to look at Exhibit No. 2.

A. Uh-huh.

MR. SMITH: Can I see that?

Q. (By Mr. Tarro) During the period of time that you were an owner of Empire Jewelry Company, did the company manufacture an angel using four crystal stones and a brass ring as a halo as illustrated in the sample which I've marked as Exhibit No. 2?

A. Not that I can ever remember.

Q. During the period of time that you were an owner of Empire Jewelry Company, did the company sell, distribute

or advertise for sale an angel made out of four crystal stones assembled together with a brass ring as a halo as illustrated by the sample which I've marked as Exhibit No. 2?

A. Again, not that I can remember.

Q. Okay. Do you know an individual by the name of Nicholas Verrechia?

A. I don't think so. I know Verrechia's, but I don't know the name Nick.

Q. Do you know if a Nick Verrechia was employed by Empire Jewelry during the period of time that you were an owner there?

A. Possibly could have, you know. I mean, that's a long time. We had a lot of employees then.

Q. Okay. Well, during the period of time that you were an owner of Empire Jewelry, did you designate anyone to design an angel made out of four stones with the brass ring as a halo as illustrated by the sample marked as Exhibit No. 2?

A. Not that I can remember. I don't think -- I don't know. I don't think so, but the reason I say that is we were four owners then, my father, my uncle, myself and my brother, you know, and I don't know if Nicholas -- how old is this fellow?

Q. I would say late thirties, early forties.
A. Late thirties. Well, I don't know. There's no way I can possibly remember a guy by that name working for us. I can only remember one young man that used to work soldering for us, and I don't remember his name at all. I remember he was a young guy. At the time he was young in his twenties. Empire Jewelry, that's got to be 25 years ago, 20, 25 years ago.
Q. Okay. But as you sit here today, you don't have any recollection of Empire Jewelry selling or distributing or marketing for sale a jewelry piece the same as is illustrated by the sample marked as Exhibit No. 2; is that correct?
A. No.
MR. SMITH: Objection. Go ahead.
A. No, I -- I never recall manufacturing that item.
Q. (By Mr. Tarro) Okay. And you were in charge of sales at Empire Jewelry during the period that you were an owner?
A. Yes.
Q. And you were in charge of the design department?
A. Yep.
MR. TARRO: Okay. Thank you. I have no further questions.

# EXHIBIT A

## ASSIGNMENT

This agreement is made this 19th day of August, 1997, between Bharat Dass, a citizen of the United Kingdom and domiciliary of the United States ("Assignor"), and Mag Jewelry Co., Inc., a Rhode Island corporation with its principal place of business in Cranston, Rhode Island. ("Assignee").

WHEREAS, Assignor is the owner of the work entitled "Austrian Crystal Angel Pin" ("Work"), which is the subject matter of U.S. Copyright Registration No. VA 735-686 ("Registration"); and

WHEREAS, Assignor desires to assign to Assignee and Assignee desires to acquire from Assignor all right, title, and interest in and to the Work and Registration;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby sells, assigns, and transfers to Assignee all of Assignor's right, title, and interest in and to the Work and the Registration.

IN WITNESS WHEREOF, the undersigned has executed this transfer and assignment this 19th day of August, 1997.

BHARAT DASS